# BENNIS *v.* MICHIGAN

No. 94–8729.   Argued November 29, 1995—Decided March 4, 1996

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, THOMAS, and GINSBURG, JJ., joined. THOMAS, J., *post*, p. 453, and GINSBURG, J., *post*, p. 457, filed concurring opinions. STEVENS, J., filed a dissenting opinion, in which SOUTER and BREYER, JJ., joined, *post*, p. 458. KENNEDY, J., filed a dissenting opinion, *post*, p. 472.

*Stefan B. Herpel* argued the cause and filed briefs for petitioner.

*Larry L. Roberts* argued the cause for respondent. With him on the brief were *John D. O'Hair* and *George E. Ward*.

*Richard H. Seamon* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney,* and *Deputy Solicitor General Dreeben.** 

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner was a joint owner, with her husband, of an automobile in which her husband engaged in sexual activity with a prostitute. A Michigan court ordered the automobile forfeited as a public nuisance, with no offset for her interest, notwithstanding her lack of knowledge of her husband's activity. We hold that the Michigan court order did not offend the Due Process Clause of the Fourteenth Amendment or the Takings Clause of the Fifth Amendment.

Detroit police arrested John Bennis after observing him engaged in a sexual act with a prostitute in the automobile while it was parked on a Detroit city street. Bennis was convicted of gross indecency.[1] The State then sued both

---

*Briefs of *amici curiae* urging reversal were filed for the American Bankers Association by *John J. Gill III* and *Michael F. Crotty;* for the Institute for Justice by *William H. Mellor III* and *Clint Bolick;* and for the National Association of Criminal Defense Lawyers by *E. E. Edwards III* and *Richard J. Troberman.*

*Richard K. Willard* and *Robert Teir* filed a brief of *amicus curiae* for the American Alliance for Rights and Responsibilities et al.

[1] Mich. Comp. Laws § 750.338b (1979).

Bennis and his wife, petitioner Tina B. Bennis, to have the car declared a public nuisance and abated as such under §§ 600.3801[2] and 600.3825[3] of Michigan's Compiled Laws.

Petitioner defended against the abatement of her interest in the car on the ground that, when she entrusted her husband to use the car, she did not know that he would use it to violate Michigan's indecency law. The Wayne County Circuit Court rejected this argument, declared the car a public nuisance, and ordered the car's abatement. In reaching this disposition, the trial court judge recognized the remedial discretion he had under Michigan's case law. App. 21. He

---

[2] Section 600.3801 states in pertinent part:

"Any building, vehicle, boat, aircraft, or place used for the purpose of lewdness, assignation or prostitution or gambling, or used by, or kept for the use of prostitutes or other disorderly persons, . . . is declared a nuisance, . . . and all . . . nuisances shall be enjoined and abated as provided in this act and as provided in the court rules. Any person or his or her servant, agent, or employee who owns, leases, conducts, or maintains any building, vehicle, or place used for any of the purposes or acts set forth in this section is guilty of a nuisance." Mich. Comp. Laws Ann. § 600.3801 (West Supp. 1995).

[3] Section 600.3825 states in pertinent part:

"(1) Order of abatement. If the existence of the nuisance is established in an action as provided in this chapter, an order of abatement shall be entered as a part of the judgment in the case, which order shall direct the removal from the building or place of all furniture, fixtures and contents therein and shall direct the sale thereof in the manner provided for the sale of chattels under execution . . . .

"(2) Vehicles, sale. Any vehicle, boat, or aircraft found by the court to be a nuisance within the meaning of this chapter, is subject to the same order and judgment as any furniture, fixtures and contents as herein provided.

"(3) Sale of personalty, costs, liens, balance to state treasurer. Upon the sale of any furniture, fixtures, contents, vehicle, boat or aircraft as provided in this section, the officer executing the order of the court shall, after deducting the expenses of keeping such property and costs of such sale, pay all liens according to their priorities . . . , and shall pay the balance to the state treasurer to be credited to the general fund of the state. . . ." Mich. Comp. Laws § 600.3825 (1979).

took into account the couple's ownership of "another automobile," so they would not be left "without transportation." *Id.*, at 25. He also mentioned his authority to order the payment of one-half of the sale proceeds, after the deduction of costs, to "the innocent co-title holder." *Id.*, at 21. He declined to order such a division of sale proceeds in this case because of the age and value of the car (an 11-year-old Pontiac sedan recently purchased by John and Tina Bennis for $600); he commented in this regard: "[T]here's practically nothing left minus costs in a situation such as this." *Id.*, at 25.

· The Michigan Court of Appeals reversed, holding that regardless of the language of Michigan Compiled Law § 600.3815(2),[4] Michigan Supreme Court precedent interpreting this section prevented the State from abating petitioner's interest absent proof that she knew to what end the car would be used. Alternatively, the intermediate appellate court ruled that the conduct in question did not qualify as a public nuisance because only one occurrence was shown and there was no evidence of payment for the sexual act. 200 Mich. App. 670, 504 N. W. 2d 731 (1993).

The Michigan Supreme Court reversed the Court of Appeals and reinstated the abatement in its entirety. 447 Mich. 719, 527 N. W. 2d 483 (1994). It concluded as a matter of state law that the episode in the Bennis vehicle was an abatable nuisance. Rejecting the Court of Appeals' interpretation of § 600.3815(2), the court then announced that, in order to abate an owner's interest in a vehicle, Michigan does not need to prove that the owner knew or agreed that her vehicle would be used in a manner proscribed by § 600.3801 when she entrusted it to another user. *Id.*, at 737, 527 N. W. 2d, at 492. The court next addressed petitioner's

---

[4] "Proof of knowledge of the existence of the nuisance on the part of the defendants or any of them, is not required." Mich. Comp. Laws § 600.3815(2) (1979).

federal constitutional challenges to the State's abatement scheme: The court assumed that petitioner did not know of or consent to the misuse of the Bennis car, and concluded in light of our decisions in *Van Oster* v. *Kansas*, 272 U. S. 465 (1926), and *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663 (1974), that Michigan's failure to provide an innocent-owner defense was "without constitutional consequence." 447 Mich., at 740–741, 527 N. W. 2d, at 493–494. The Michigan Supreme Court specifically noted that, in its view, an owner's interest may not be abated when "a vehicle is used without the owner's consent." *Id.*, at 742, n. 36, 527 N. W. 2d, at 495, n. 36. Furthermore, the court confirmed the trial court's description of the nuisance abatement proceeding as an "equitable action," and considered it "critical" that the trial judge so comprehended the statute. *Id.*, at 742, 527 N. W. 2d, at 495.

We granted certiorari in order to determine whether Michigan's abatement scheme has deprived petitioner of her interest in the forfeited car without due process, in violation of the Fourteenth Amendment, or has taken her interest for public use without compensation, in violation of the Fifth Amendment as incorporated by the Fourteenth Amendment. 515 U. S. 1121 (1995). We affirm.

The gravamen of petitioner's due process claim is not that she was denied notice or an opportunity to contest the abatement of her car; she was accorded both. Cf. *United States* v. *James Daniel Good Real Property*, 510 U. S. 43 (1993). Rather, she claims she was entitled to contest the abatement by showing she did not know her husband would use it to violate Michigan's indecency law. But a long and unbroken line of cases holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use.

Our earliest opinion to this effect is Justice Story's opinion for the Court in *The Palmyra*, 12 Wheat. 1 (1827). The Pal-

myra, which had been commissioned as a privateer by the King of Spain and had attacked a United States vessel, was captured by a United States warship and brought into Charleston, South Carolina, for adjudication. *Id.*, at 8. On the Government's appeal from the Circuit Court's acquittal of the vessel, it was contended by the owner that the vessel could not be forfeited until he was convicted for the privateering. The Court rejected this contention, explaining: "The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing." *Id.*, at 14. In another admiralty forfeiture decision 17 years later, Justice Story wrote for the Court that in *in rem* admiralty proceedings "the acts of the master and crew . . . bind the interest of the owner of the ship, *whether he be innocent or guilty;* and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." *Harmony* v. *United States*, 2 How. 210, 234 (1844) (emphasis added).

In *Dobbins's Distillery* v. *United States*, 96 U. S. 395, 401 (1878), this Court upheld the forfeiture of property used by a lessee in fraudulently avoiding federal alcohol taxes, observing: "Cases often arise where the property of the owner is forfeited on account of the fraud, neglect, or misconduct of those intrusted with its possession, care, and custody, even when the owner is otherwise without fault . . . and it has always been held . . . that the acts of [the possessors] bind the interest of the owner . . . whether he be innocent or guilty."

In *Van Oster* v. *Kansas*, 272 U. S. 465 (1926), this Court upheld the forfeiture of a purchaser's interest in a car misused by the seller. Van Oster purchased an automobile from a dealer but agreed that the dealer might retain possession for use in its business. The dealer allowed an associate to use the automobile, and the associate used it for the illegal transportation of intoxicating liquor. *Id.*, at 465–466. The State brought a forfeiture action pursuant to a Kansas stat-

ute, and Van Oster defended on the ground that the transportation of the liquor in the car was without her knowledge or authority. This Court rejected Van Oster's claim:

> "It is not unknown or indeed uncommon for the law to visit upon the owner of property the unpleasant consequences of the unauthorized action of one to whom he has entrusted it. Much of the jurisdiction in admiralty, so much of the statute and common law of liens as enables a mere bailee to subject the bailed property to a lien, the power of a vendor of chattels in possession to sell and convey good title to a stranger, are familiar examples. . . . They suggest that certain uses of property may be regarded as so undesirable that the owner surrenders his control at his peril. . . .
>
> "It has long been settled that statutory forfeitures of property entrusted by the innocent owner or lienor to another who uses it in violation of the revenue laws of the United States is not a violation of the due process clause of the Fifth Amendment." *Id.*, at 467–468.

The *Van Oster* Court relied on *J. W. Goldsmith, Jr.-Grant Co.* v. *United States*, 254 U. S. 505 (1921), in which the Court upheld the forfeiture of a seller's interest in a car misused by the purchaser. The automobile was forfeited after the purchaser transported bootleg distilled spirits in it, and the selling dealership lost the title retained as security for unpaid purchase money. *Id.*, at 508–509. The Court discussed the arguments for and against allowing the forfeiture of the interest of an owner who was "without guilt," *id.*, at 510, and concluded that "whether the reason for [the challenged forfeiture scheme] be artificial or real, it is too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced," *id.*, at 511.[5]

---

[5] In *Austin* v. *United States*, 509 U. S. 602, 617 (1993), the Court observed that *J. W. Goldsmith, Jr.-Grant Co.* v. *United States*, 254 U. S. 505 (1921), "expressly reserved the question whether the [guilty-property]

In *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663 (1974), the most recent decision on point, the Court reviewed the same cases discussed above, and concluded that "the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." *Id.*, at 683.. Petitioner is in the same position as the various owners involved in the forfeiture cases beginning with *The Palmyra* in 1827. She did not know that her car would be used in an illegal activity that would subject it to forfeiture. But under these cases the Due Process Clause of the Fourteenth Amendment does not protect her interest against forfeiture by the government.

Petitioner relies on a passage from *Calero-Toledo*, that "it would be difficult to reject the constitutional claim of . . . an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done

---

fiction could be employed to forfeit the property of a truly innocent owner." This observation is quite mistaken. The *Goldsmith-Grant* Court expressly reserved opinion "as to whether the section can be extended to property *stolen* from the owner or otherwise taken from him *without his privity or consent.*" *Id.*, at 512 (emphases added). In other words, the *Goldsmith-Grant* Court drew the very same distinction made by the Michigan Supreme Court in this case: "the distinction between the situation in which a vehicle is used without the owner's consent," and one in which, "although the owner consented to [another person's] use, [the vehicle] is used in a *manner* to which the owner did not consent." 447 Mich., at 742, n. 36, 527 N. W. 2d, at 495, n. 36. Because John Bennis co-owned the car at issue, petitioner cannot claim she was in the former situation.

The dissent, *post*, at 466–468, and n. 12, quoting *Peisch* v. *Ware*, 4 Cranch 347, 364 (1808), seeks to enlarge the reservation in *Goldsmith-Grant* into a general principle that "'a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of a forfeiture may be employed.'" But *Peisch* was dealing with the same question reserved in *Goldsmith-Grant*, not any broader proposition: "If, by private theft, or open robbery, without any fault on his part, [an owner's] property should be invaded, . . . the law cannot be understood to punish him with the forfeiture of that property." 4 Cranch, at 364.

all that reasonably could be expected to prevent the proscribed use of his property." 416 U. S., at 689. But she concedes that this comment was *obiter dictum,* and "[i]t is to the holdings of our cases, rather than their dicta, that we must attend." *Kokkonen* v. *Guardian Life Ins. Co. of America,* 511 U. S. 375, 379 (1994). And the *holding* of *Calero-Toledo* on this point was that the interest of a yacht rental company in one of its leased yachts could be forfeited because of its use for transportation of controlled substances, even though the company was "'in no way . . . involved in the criminal enterprise carried on by [the] lessee' and 'had no knowledge that its property was being used in connection with or in violation of [Puerto Rican Law].'" 416 U. S., at 668. Petitioner has made no showing beyond that here.

JUSTICE STEVENS' dissent argues that our cases treat contraband differently from instrumentalities used to convey contraband, like cars: Objects in the former class are forfeitable "however blameless or unknowing their owners may be," *post,* at 459, but with respect to an instrumentality in the latter class, an owner's innocence is no defense only to the "principal use being made of that property," *post,* at 461. However, this Court's precedent has never made the due process inquiry depend on whether the use for which the instrumentality was forfeited was the principal use. If it had, perhaps cases like *Calero-Toledo,* in which Justice Douglas noted in dissent that there was no showing that the "yacht had been notoriously used in smuggling drugs . . . and so far as we know only one marihuana cigarette was found on the yacht," 416 U. S., at 693 (opinion dissenting in part), might have been decided differently.

The dissent also suggests that *The Palmyra* line of cases "would justify the confiscation of an ocean liner just because one of its passengers sinned while on board." *Post,* at 462. None of our cases have held that an ocean liner may be confiscated because of the activities of one passenger. We said in *Goldsmith-Grant,* and we repeat here, that "[w]hen such

application shall be made it will be time enough to pronounce upon it." 254 U. S., at 512.

Notwithstanding this well-established authority rejecting the innocent-owner defense, petitioner argues that we should in effect overrule it by importing a culpability requirement from cases having at best a tangential relation to the "innocent owner" doctrine in forfeiture cases. She cites *Foucha* v. *Louisiana*, 504 U. S. 71 (1992), for the proposition that a criminal defendant may not be punished for a crime if he is found to be not guilty. She also argues that our holding in *Austin* v. *United States*, 509 U. S. 602 (1993), that the Excessive Fines Clause [6] limits the scope of civil forfeiture judgments, "would be difficult to reconcile with any rule allowing truly innocent persons to be punished by civil forfeiture." Brief for Petitioner 18–19, n. 12.

In *Foucha* the Court held that a defendant found not guilty by reason of insanity in a criminal trial could not be thereafter confined indefinitely by the State without a showing that he was either dangerous or mentally ill. Petitioner argues that our statement that in those circumstances a State has no "punitive interest" which would justify continued detention, 504 U. S., at 80, requires that Michigan demonstrate a punitive interest in depriving her of her interest in the forfeited car. But, putting aside the extent to which a forfeiture proceeding is "punishment" in the first place, *Foucha* did not purport to discuss, let alone overrule, *The Palmyra* line of cases.

In *Austin*, the Court held that because "forfeiture serves, at least in part, to punish the owner," forfeiture proceedings are subject to the limitations of the Eighth Amendment's prohibition against excessive fines. 509 U. S., at 618. There was no occasion in that case to deal with the validity of the "innocent-owner defense," other than to point out that if a forfeiture statute allows such a defense, the defense is

---

[6] U. S. Const., Amdt. 8.

additional evidence that the statute itself is "punitive" in motive. *Id.*, at 617–618. In this case, however, Michigan's Supreme Court emphasized with respect to the forfeiture proceeding at issue: "It is not contested that this is an equitable action," in which the trial judge has discretion to consider "alternatives [to] abating the entire interest in the vehicle." 447 Mich., at 742, 527 N. W. 2d, at 495.

In any event, for the reasons pointed out in *Calero-Toledo* and *Van Oster*, forfeiture also serves a deterrent purpose distinct from any punitive purpose. Forfeiture of property prevents illegal uses "both by preventing further illicit use of the [property] and by imposing an economic penalty, thereby rendering illegal behavior unprofitable." *Calero-Toledo, supra,* at 687. This deterrent mechanism is hardly unique to forfeiture. For instance, because Michigan also deters dangerous driving by making a motor vehicle owner liable for the negligent operation of the vehicle by a driver who had the owner's consent to use it, petitioner was also potentially liable for her husband's use of the car in violation of Michigan negligence law. Mich. Comp. Laws § 257.401 (1979). "The law thus builds a secondary defense against a forbidden use and precludes evasions by dispensing with the necessity of judicial inquiry as to collusion between the wrongdoer and the alleged innocent owner." *Van Oster*, 272 U. S., at 467–468.

Petitioner also claims that the forfeiture in this case was a taking of private property for public use in violation of the Takings Clause of the Fifth Amendment, made applicable to the States by the Fourteenth Amendment. But if the forfeiture proceeding here in question did not violate the Fourteenth Amendment, the property in the automobile was transferred by virtue of that proceeding from petitioner to the State. The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain. *United States* v. *Fuller,*

409 U. S. 488, 492 (1973); see *United States* v. *Rands,* 389 U. S. 121, 125 (1967).

At bottom, petitioner's claims depend on an argument that the Michigan forfeiture statute is unfair because it relieves prosecutors from the burden of separating co-owners who are complicit in the wrongful use of property from innocent co-owners. This argument, in the abstract, has considerable appeal, as we acknowledged in *Goldsmith-Grant,* 254 U. S., at 510. Its force is reduced in the instant case, however, by the Michigan Supreme Court's confirmation of the trial court's remedial discretion, see *supra,* at 446, and petitioner's recognition that Michigan may forfeit her and her husband's car whether or not she is entitled to an offset for her interest in it, Tr. of Oral Arg. 7, 9.

We conclude today, as we concluded 75 years ago, that the cases authorizing actions of the kind at issue are "too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced." *Goldsmith-Grant, supra,* at 511. The State here sought to deter illegal activity that contributes to neighborhood deterioration and unsafe streets. The Bennis automobile, it is conceded, facilitated and was used in criminal activity. Both the trial court and the Michigan Supreme Court followed our longstanding practice, and the judgment of the Supreme Court of Michigan is therefore

*Affirmed.*

JUSTICE THOMAS, concurring.

I join the opinion of the Court.

Mrs. Bennis points out that her property was forfeited even though the State did not prove her guilty of any wrongdoing. The State responds that forfeiture of property simply because it was used in crime has been permitted time out of mind. It also says that it wants to punish, for deterrence and perhaps also for retributive purposes, persons who *may* have colluded or acquiesced in criminal use of their

property, or who *may* at least have negligently entrusted their property to someone likely to use it for misfeasance. But, the State continues, it does not want to have to *prove* (or to refute proof regarding) collusion, acquiescence, or negligence.

As the Court notes, evasion of the normal requirement of proof before punishment might well seem "unfair." *Ante*, at 453. One unaware of the history of forfeiture laws and 200 years of this Court's precedent regarding such laws might well assume that such a scheme is lawless—a violation of due process. As the Court remarked 75 years ago in ruling upon a constitutional challenge to forfeiture of the property of an innocent owner:

> "If the case were the first of its kind, it and its apparent paradoxes might compel a lengthy discussion to harmonize the [statute at issue] with the accepted tests of human conduct. . . . There is strength . . . in the contention that . . . [the statute at issue] seems to violate that justice which should be the foundation of the due process of law required by the Constitution." *J. W. Goldsmith, Jr.-Grant Co.* v. *United States*, 254 U. S. 505, 510 (1921).

But the Court went on to uphold the statute, based upon the historical prevalence and acceptance of similar laws. *Id.*, at 510–511.

This case is ultimately a reminder that the Federal Constitution does not prohibit everything that is intensely undesirable. See, *e. g., Herrera* v. *Collins*, 506 U. S. 390, 428, and n. (1993) (SCALIA, J., concurring). As detailed in the Court's opinion and the cases cited therein, forfeiture of property without proof of the owner's wrongdoing, merely because it was "used" in or was an "instrumentality" of crime has been permitted in England and this country, both before and after the adoption of the Fifth and Fourteenth Amendments. Cf. *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 619 (1990) (plurality opinion) (a process of law that

can show the sanction of settled usage both in England and in this country must be taken to be due process of law) (citing *Hurtado* v. *California,* 110 U. S. 516, 528–529 (1884)). Indeed, 70 years ago this Court held in *Van Oster* v. *Kansas,* 272 U. S. 465 (1926), that an automobile used in crime could be forfeited notwithstanding the absence of any proof that the criminal use occurred with "knowledge or authority" of the owner. *Id.,* at 466. A law of forfeiture without an exception for innocent owners, the Court said, "builds a secondary defense" for the State "against a forbidden use and precludes evasions by dispensing with the necessity of judicial inquiry as to collusion between the wrongdoer and the alleged innocent owner." *Id.,* at 467–468.

The limits on *what* property can be forfeited as a result of what wrongdoing—for example, what it means to "use" property in crime for purposes of forfeiture law—are not clear to me. See *United States* v. *James Daniel Good Real Property,* 510 U. S. 43, 81–83 (1993) (THOMAS, J., concurring in part and dissenting in part). Those limits, whatever they may be, become especially significant when they are the sole restrictions on the state's ability to take property from those it merely suspects, or does not even suspect, of colluding in crime. It thus seems appropriate, where a constitutional challenge by an innocent owner is concerned, to apply those limits rather strictly, adhering to historical standards for determining whether specific property is an "instrumentality" of crime. Cf. *J. W. Goldsmith, Jr.-Grant Co., supra,* at 512 (describing more extreme hypothetical applications of a forfeiture law and reserving decision on the permissibility of such applications). The facts here, however, do not seem to me to be obviously distinguishable from those involved in *Van Oster;* and in any event, Mrs. Bennis has not asserted that the car was not an instrumentality of her husband's crime.

If anything, the forfeiture in *Van Oster* was harder to justify than is the forfeiture here, albeit in a different respect.

In this case, the trial judge apparently found that the sales price of the car would not exceed by much the "costs" to be deducted from the sale; and he took that fact into account in determining how to dispose of the proceeds of the sale of the car. The state statute has labeled the car a "nuisance" and authorized a procedure for preventing the risk of continued criminal use of it by Mr. Bennis (forfeiture and sale); under a different statutory regime, the State might have authorized the destruction of the car instead, and the State would have had a plausible argument that the order for destruction was "remedial" and thus noncompensable. That it chose to order the car sold, with virtually nothing left over for the State after "costs," may not change the "remedial" character of the State's action substantially. And if the forfeiture of the car here (and the State's refusal to remit any share of the proceeds from its sale to Mrs. Bennis) can appropriately be characterized as "remedial" action, then the more severe problems involved in punishing someone not found to have engaged in wrongdoing of any kind do not arise.*

Improperly used, forfeiture could become more like a roulette wheel employed to raise revenue from innocent but hapless owners whose property is unforeseeably misused, or a tool wielded to punish those who associate with criminals,. than a component of a system of justice. When the property sought to be forfeited has been entrusted by its owner to one who uses it for crime, however, the Constitution apparently

---

*This is most obviously true if, in stating that there would be little left over after "costs," the trial judge was referring to the costs of sale. The court's order indicates that he may have had other "costs" in mind as well when he made that statement, e. g., law enforcement costs. See also Mich. Comp. Laws § 600.3825(3) (1979) (costs of keeping the car to be deducted). Even if the "costs" that the trial judge believed would consume most of the sales proceeds included not simply the expected costs of sale, but also the State's costs of keeping the car and law enforcement costs related to this particular proceeding, the State would still have a plausible argument that using the sales proceeds to pay such costs was "remedial" action, rather than punishment.

assigns to the States and to the political branches of the Federal Government the primary responsibility for avoiding that result.

JUSTICE GINSBURG, concurring.

I join the opinion of the Court and highlight features of the case key to my judgment.

The dissenting opinions target a law scarcely resembling Michigan's "red light abatement" prescription, as interpreted by the State's courts. First, it bears emphasis that the car in question belonged to John Bennis as much as it did to Tina Bennis. At all times he had her consent to use the car, just as she had his. See *ante*, at 448–449, n. 5 (majority opinion) (noting Michigan Supreme Court's distinction between use of a vehicle without the owner's consent, and use with consent but in a manner to which the owner did not consent). And it is uncontested that Michigan may forfeit the vehicle itself. See *ante*, at 453 (majority opinion) (citing Tr. of Oral Arg. 7, 9). The sole question, then, is whether Tina Bennis is entitled not to the car, but to a portion of the proceeds (if any there be after deduction of police, prosecutorial, and court costs) as a matter of constitutional right.

Second, it was "critical" to the judgment of the Michigan Supreme Court that the nuisance abatement proceeding is an "equitable action." See *ante*, at 446 (majority opinion) (citing 447 Mich. 719, 742, 527 N. W. 2d 483, 495 (1994)). That means the State's Supreme Court stands ready to police exorbitant applications of the statute. It shows no respect for Michigan's high court to attribute to its members tolerance of, or insensitivity to, inequitable administration of an "equitable action."

Nor is it fair to charge the trial court with "blatant unfairness" in the case at hand. See *post*, at 470–471, n. 14, and 472 (STEVENS, J., dissenting). That court declined to order a division of sale proceeds, as the trial judge took pains to explain, for two practical reasons: the Bennises have "an-

other automobile," App. 25; and the age and value of the forfeited car (an 11-year-old Pontiac purchased by John and Tina Bennis for $600) left "practically nothing" to divide after subtraction of costs. See *ante*, at 445 (majority opinion) (citing App. 25).

Michigan, in short, has not embarked on an experiment to punish innocent third parties. See *post* this page (STEVENS, J., dissenting). Nor do we condone any such experiment. Michigan has decided to deter johns from using cars they own (or co-own) to contribute to neighborhood blight, and that abatement endeavor hardly warrants this Court's disapprobation.

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE BREYER join, dissenting.

For centuries prostitutes have been plying their trade on other people's property. Assignations have occurred in palaces, luxury hotels, cruise ships, college dormitories, truck stops, back alleys and back seats. A profession of this vintage has provided governments with countless opportunities to use novel weapons to curtail its abuses. As far as I am aware, however, it was not until 1988 that any State decided to experiment with the punishment of innocent third parties by confiscating property in which, or on which, a single transaction with a prostitute has been consummated.

The logic of the Court's analysis would permit the States to exercise virtually unbridled power to confiscate vast amounts of property where professional criminals have engaged in illegal acts. Some airline passengers have marijuana cigarettes in their luggage; some hotel guests are thieves; some spectators at professional sports events carry concealed weapons; and some hitchhikers are prostitutes. The State surely may impose strict obligations on the owners of airlines, hotels, stadiums, and vehicles to exercise a high degree of care to prevent others from making illegal use of their property, but neither logic nor history supports the

Court's apparent assumption that their complete innocence imposes no constitutional impediment to the seizure of their property simply because it provided the locus for a criminal transaction.

In order to emphasize the novelty of the Court's holding, I shall first comment on the tenuous connection between the property forfeited here and the illegal act that was intended to be punished, which differentiates this case from the precedent on which the Court relies. I shall then comment on the significance of the complete lack of culpability ascribable to petitioner in this case. Finally, I shall explain why I believe our recent decision in *Austin* v. *United States*, 509 U. S. 602 (1993), compels reversal.

## I

For purposes of analysis it is useful to identify three different categories of property that are subject to seizure: pure contraband; proceeds of criminal activity; and tools of the criminal's trade.

The first category—pure contraband—encompasses items such as adulterated food, sawed-off shotguns, narcotics, and smuggled goods. With respect to such "objects the possession of which, without more, constitutes a crime," *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U. S. 693, 699 (1965), the government has an obvious remedial interest in removing the items from private circulation, however blameless or unknowing their owners may be. The States' broad and well-established power to seize pure contraband is not implicated by this case, for automobiles are not contraband. See *ibid.*

The second category—proceeds—traditionally covered only stolen property, whose return to its original owner has a powerful restitutionary justification. Recent federal statutory enactments have dramatically enlarged this category to include the earnings from various illegal transactions. See *United States* v. *Parcel of Rumson, N. J., Land,* 507 U. S.

111, 121, n. 16 (1993). Because those federal statutes include protections for innocent owners, see 21 U. S. C. § 881(a)(6), cases arising out of the seizure of proceeds do not address the question whether the Constitution would provide a defense to an innocent owner in certain circumstances if the statute had not done so. The prevalence of protection for innocent owners in such legislation does, however, lend support to the conclusion that elementary notions of fairness require some attention to the impact of a seizure on the rights of innocent parties.[1]

The third category includes tools or instrumentalities that a wrongdoer has used in the commission of a crime, also known as "derivative contraband," see *One 1958 Plymouth Sedan*, 380 U. S., at 699. Forfeiture is more problematic for this category of property than for the first two, both because of its potentially far broader sweep, and because the government's remedial interest in confiscation is less apparent. Many of our earliest cases arising out of these kinds of seizures involved ships that engaged in piracy on the high seas,[2] in the slave trade,[3] or in the smuggling of cargoes of goods into the United States.[4] These seizures by the sovereign

---

[1] Without some form of an exception for innocent owners, the potential breadth of forfeiture actions for illegal proceeds would be breathtaking indeed. It has been estimated that nearly every United States bill in circulation—some $230 billion worth—carries trace amounts of cocaine, so great is the drug trade's appetite for cash. See Range & Witkin, The Drug-Money Hunt, U. S. News & World Report, Aug. 21, 1989, p. 22; Heilbroner, The Law Goes on a Treasure Hunt, N. Y. Times, Dec. 11, 1994, p. 70, col. 1. Needless to say, a rule of strict liability would have catastrophic effects for the Nation's economy.

[2] See, *e. g., The Palmyra*, 12 Wheat. 1 (1827); *Harmony* v. *United States*, 2 How. 210 (1844). The latter case has occasionally been cited by other names, including "*Malek Adhel*," see O. Holmes, The Common Law 27, n. 82 (M. Howe ed. 1963).

[3] See, *e. g., Tryphenia* v. *Harrison*, 24 F. Cas. 252 (No. 14,209) (CC Pa. 1806) (Washington, J.).

[4] See *C. J. Hendry Co.* v. *Moore*, 318 U. S. 133, 145–148 (1943) (collecting cases); *Harmony*, 2 How., at 233–234.

were approved despite the faultlessness of the ship's owner. Because the entire mission of the ship was unlawful, admiralty law treated the vessel itself as if it were the offender.[5] Moreover, under "the maritime law of the Middle Ages the ship was not only the source, but the limit, of liability."[6]

The early admiralty cases demonstrate that the law may reasonably presume that the owner of valuable property is aware of the principal use being made of that property. That presumption provides an adequate justification for the deprivation of one's title to real estate because of another's adverse possession for a period of years or for a seizure of such property because its principal use is unlawful. Thus, in *Dobbins's Distillery* v. *United States*, 96 U. S. 395, 399 (1878), we upheld the seizure of premises on which the lessee operated an unlawful distillery when the owner "knowingly suffer[ed] and permitt[ed] his land to be used as a site" for that distillery. And despite the faultlessness of their owners, we have upheld seizures of vehicles being used to trans-

---

[5] "The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner. The vessel or boat (says the act of Congress) from which such piratical aggression, &c., shall have been first attempted or made shall be condemned. Nor is there any thing new in a provision of this sort. It is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offence has been done as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof. And this is done from the necessity of the case, as the only adequate means of suppressing the offence or wrong, or insuring an indemnity to the injured party. The doctrine also is familiarly applied to cases of smuggling and other misconduct under our revenue laws; and has been applied to other kindred cases, such as cases arising on embargo and non-intercourse acts. In short, the acts of the master and crew, in cases of this sort, bind the interest of the owner to the ship, whether he be innocent or guilty; and he impliedly submits to whatever the law denounces as a forfeiture attached to the ship by reason of their unlawful or wanton wrongs." *Ibid.*

[6] Holmes, The Common Law, at 27.

port bootleg liquor, or to smuggle goods into the United States in violation of our customs laws.[7]

While our historical cases establish the propriety of seizing a freighter when its entire cargo consists of smuggled goods, none of them would justify the confiscation of an ocean liner just because one of its passengers sinned while on board. See, *e. g., Phile* v. *Ship Anna,* 1 Dall. 197, 206 (C. P. Phila. Cty. 1787) (holding that forfeiture of a ship was inappropriate if an item of contraband hidden on board was "a trifling thing, easily concealed, and which might fairly escape the notice of the captain"); *J. W. Goldsmith, Jr.-Grant Co.* v. *United States,* 254 U. S. 505, 512 (1921) (expressing doubt about expansive forfeiture applications). The principal use of the car in this case was not to provide a site for petitioner's husband to carry out forbidden trysts. Indeed, there is no evidence in the record that the car had ever previously been used for a similar purpose. An isolated misuse of a stationary vehicle should not justify the forfeiture of an innocent owner's property on the theory that it constituted an instrumentality of the crime.

This case differs from our historical precedents in a second, crucial way. In those cases, the vehicles or the property actually facilitated the offenses themselves. See *id.,* at 513 (referring to "the adaptability of a particular form of property to an illegal purpose"); *Harmony* v. *United States,* 2 How. 210, 235 (1844). Our leading decisions on forfeited conveyances, for example, involved offenses of which transportation was an element. In *Van Oster* v. *Kansas,* 272 U. S. 465 (1926), for example, the applicable statute prohibited transportation of intoxicating liquor. See *id.,* at 466. See also *Carroll* v. *United States,* 267 U. S. 132, 136 (1925) (car

---

[7] See, *e. g., Van Oster* v. *Kansas,* 272 U. S. 465 (1926) (transportation); *J. W. Goldsmith, Jr.-Grant Co.* v. *United States,* 254 U. S. 505 (1921) (same); *General Motors Acceptance Corp.* v. *United States,* 286 U. S. 49 (1932) (importation); *United States* v. *Commercial Credit Co.,* 286 U. S. 63 (1932) (same).

had concealed compartments for carrying liquor). In *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663 (1974), similarly, a yacht was seized because it had been used "to transport, or to facilitate the transportation of," a controlled substance. See *id.*, at 665–666.[8] Here, on the other hand, the forfeited property bore no necessary connection to the offense committed by petitioner's husband. It is true that the act occurred in the car, but it might just as well have occurred in a multitude of other locations. The mobile character of the car played a part only in the negotiation, but not in the consummation, of the offense.

In recent years, a majority of the Members of this Court has agreed that the concept of an instrumentality subject to forfeiture—also expressed as the idea of "tainted" items—must have an outer limit. In *Austin*, the Court rejected the argument that a mobile home and auto body shop where an illegal drug transaction occurred were forfeitable as "instruments" of the drug trade. 509 U. S., at 621. JUSTICE SCALIA agreed that a building in which an isolated drug sale happens to take place also cannot be regarded as an instrumentality of that offense. *Id.*, at 627–628 (opinion concurring in part and concurring in judgment). JUSTICE THOMAS, too, has stated that it is difficult to see how real property bearing no connection to crime other than serving as the location for a drug transaction is in any way "guilty" of an offense. See *United States* v. *James Daniel Good Real Property*, 510 U. S. 43, 81–82 (1993) (opinion concurring in part and dissenting in part). The car in this case, however,

---

[8] The majority questions whether the yacht was actually used to transport drugs, quoting Justice Douglas' dissenting statement that " 'so far as we know' " only one marijuana cigarette was found on board. See *ante*, at 450. Justice Douglas cited no source for that assertion, however, and it does not appear in the majority or concurring opinions. According to the stipulated facts of the case, the Commonwealth of Puerto Rico accused the lessee of using the yacht to "convey, transport, carry and transfer" a narcotic drug. See App. in *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, O. T. 1973, No. 73–157, p. 25.

was used as little more than an enclosure for a one-time event, effectively no different from a piece of real property.[9] By the rule laid down in our recent cases, that nexus is insufficient to support the forfeiture here.

The State attempts to characterize this forfeiture as serving exclusively remedial, as opposed to punitive, ends, because its goal was to abate what the State termed a "nuisance." Even if the State were correct, that argument would not rebut the excessiveness of the forfeiture, which I have discussed above. But in any event, there is no serious claim that the confiscation in this case was not punitive. The majority itself concedes that "'forfeiture serves, at least in part, to punish the owner.'" *Ante*, at 451 (quoting *Austin*, 509 U. S., at 618).[10] At an earlier stage of this litigation,

---

[9] In fact, the rather tenuous theory advanced by the Michigan Supreme Court to uphold this forfeiture was that the neighborhood where the offense occurred exhibited an ongoing "nuisance condition" because it had a reputation for illicit activity, and the car contributed to that "condition." 447 Mich. 719, 734, 527 N. W. 2d 483, 491 (1994). On that view, the car did not constitute the nuisance of itself; only when considered as a part of the particular neighborhood did it assume that character. See *id.*, at 745, 527 N. W. 2d, at 496 (Cavanagh, C. J., dissenting). One bizarre consequence of this theory, expressly endorsed by the Michigan high court, is that the very same offense, committed in the very same car, would not render the car forfeitable if it were parked in a different part of Detroit, such as the affluent Palmer Woods area. See *id.*, at 734, n. 22, 527 N. W. 2d, at 491, n. 22. This construction confirms the irrelevance of the car's mobility to the forfeiture; any other stationary part of the neighborhood where such an offense could take place—a shed, for example, or an apartment—could be forfeited on the same rationale. Indeed, if petitioner's husband had taken advantage of the car's power of movement, by picking up the prostitute and continuing to drive, presumably the car would not have been forfeitable at all.

[10] We have held, furthermore, that "a civil sanction that cannot be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *United States* v. *Halper*, 490 U. S. 435, 448 (1989) (emphasis added).

the State unequivocally argued that confiscation of automobiles in the circumstances of this case "is swift and certain 'punishment' of the voluntary vice consumer." Brief for Plaintiff-Appellant in No. 97339 (Mich.), p. 22. Therefore, the idea that this forfeiture did not punish petitioner's husband—and, *a fortiori*, petitioner herself—is simply not sustainable.

Even judged in isolation, the remedial interest in this forfeiture falls far short of that which we have found present in other cases. Forfeiture may serve remedial ends when removal of certain items (such as a burglar's tools) will prevent repeated violations of the law (such as housebreaking). See, *e. g., United States* v. *One Assortment of 89 Firearms,* 465 U. S. 354, 364 (1984) (confiscation of unregistered shotguns); see also *C. J. Hendry Co.* v. *Moore,* 318 U. S. 133 (1943) (seizure of fishing nets used in violation of state fishing laws). But confiscating petitioner's car does not disable her husband from using other venues for similar illegal rendezvous, since all that is needed to commit this offense is a place. In fact, according to testimony at trial, petitioner's husband had been sighted twice during the previous summer, without the car, soliciting prostitutes in the same neighborhood.[11] The remedial rationale is even less convincing according to the State's "nuisance" theory, for that theory treats the car as a nuisance only so long as the illegal event is occurring and only so long as the car is located in the relevant neighborhood. See n. 9, *supra.* The need to "abate" the car thus disappears the moment it leaves the area. In short, therefore, a remedial justification simply does not apply to a confiscation of this type. See generally Clark, Civil and Criminal Penalties and Forfeitures: A Framework for Constitutional Analysis, 60 Minn. L. Rev. 379, 479–480 (1976).

---

[11] The forfeited car was purchased in September of the same year, and thus could not have been involved in any such episodes during the preceding summer. See App. 8; 447 Mich., at 728, 527 N. W. 2d, at 488.

## II

Apart from the lack of a sufficient nexus between petitioner's car and the offense her husband committed, I would reverse because petitioner is entirely without responsibility for that act. Fundamental fairness prohibits the punishment of innocent people.

The majority insists that it is a settled rule that the owner of property is strictly liable for wrongful uses to which that property is put. See *ante*, at 446–450. Only three Terms ago, however, the Court surveyed the same historical antecedents and held that all of its forfeiture decisions rested, "at bottom, on the notion that the owner has been negligent in allowing his property to be misused and that he is properly punished for that negligence." *Austin* v. *United States*, 509 U. S., at 615 (citing *Calero-Toledo, Goldsmith-Grant Co., Dobbins's Distillery, Harmony,* and *The Palmyra*). According to *Austin*, even the hoary fiction that property was forfeitable because of its own guilt was based on the idea that " " "such misfortunes are in part owing to the negligence of the owner, and therefore he is properly punished by the forfeiture." ' " 509 U. S., at 616, quoting *Goldsmith-Grant Co.*, 254 U. S., at 510–511, in turn quoting 1 W. Blackstone, Commentaries *301. It is conceded that petitioner was in no way negligent in her use or entrustment of the family car. Thus, no forfeiture should have been permitted. The majority, however, simply ignores *Austin*'s detailed analysis of our case law without explanation or comment.

Even assuming that strict liability applies to "innocent" owners, we have consistently recognized an exception for truly blameless individuals. The Court's opinion in *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S., at 688–690, established the proposition that the Constitution bars the punitive forfeiture of property when its owner alleges and proves that he took all reasonable steps to prevent its illegal use. Accord, *Austin*, 509 U. S., at 616–617. The majority

dismisses this statement as *"obiter dictum," ante,* at 450, but we have assumed that such a principle existed, or expressly reserved the question, in a line of cases dating back nearly 200 years. In one of its earliest decisions, the Court, speaking through Chief Justice Marshall, recognized as "unquestionably a correct legal principle" that "a forfeiture can only be applied to those cases in which the means that are prescribed for the prevention of a forfeiture may be employed." *Peisch* v. *Ware,* 4 Cranch 347, 363 (1808).[12] In other contexts, we have regarded as axiomatic that persons cannot be punished when they have done no wrong. See *Southwestern Telegraph & Telephone Co.* v. *Danaher,* 238 U. S. 482, 490–491 (1915) (invalidating penalty under Due Process

---

[12] In *Peisch,* a ship was wrecked in Delaware Bay and its cargo unladen and carried off by salvors. The United States sought forfeiture of the cargo on several grounds, including failure to pay duties on certain distilled spirits in the cargo at the time of importation, and removal of the same from the tax collector before assessment. This Court held that forfeiture was impermissible because the ship's owners were unable to comply with the customs law regarding importation, since the crew had deserted the ship before landing, and the vessel could not be brought into port. 4 Cranch, at 363. As quoted above, the Court held that forfeiture is inappropriate when the means to prevent the violation cannot be carried out.

As a separate reason for rejecting the forfeiture, the Court explained that the owners could not be made to suffer for actions taken by the salvors, persons over whom the owners had no control. As the Court put it, an owner should not be "punished" by the forfeiture of property taken "by private theft, or open robbery, without any fault on his part . . . ." *Id.,* at 364. That rule has itself become an established part of our jurisprudence. See *Austin,* 509 U. S., at 614–615; *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663, 688–690 (1974); *Goldsmith-Grant Co.,* 254 U. S., at 512; *United States* v. *One Ford Coupe Automobile,* 272 U. S. 321, 333 (1926); *Van Oster* v. *Kansas,* 272 U. S., at 467. While both of the principles announced in *Peisch* arose out of the same set of facts, the majority errs when it treats them as identical. See *ante,* at 448–449, n. 5. Chief Justice Marshall's opinion discussed and justified each principle independently, and either could apply in the absence of the other.

Clause for conduct that involved "no intentional wrongdoing; no departure from any prescribed or known standard of action, and no reckless conduct"); *TXO Production Corp.* v. *Alliance Resources Corp.*, 509 U. S. 443, 454, and n. 17 (1993) (following *Danaher*); *Bordenkircher* v. *Hayes,* 434 U. S. 357, 363 (1978); see also *Bell* v. *Wolfish,* 441 U. S. 520, 580 (1979) (STEVENS, J., dissenting). I would hold now what we have always assumed: that the principle is required by due process.

The unique facts of this case demonstrate that petitioner is entitled to the protection of that rule. The subject of this forfeiture was certainly not contraband. It was not acquired with the proceeds of criminal activity and its principal use was entirely legitimate. It was an ordinary car that petitioner's husband used to commute to the steel mill where he worked. Petitioner testified that they had been married for nine years; that she had acquired her ownership interest in the vehicle by the expenditure of money that she had earned herself; that she had no knowledge of her husband's plans to do anything with the car except "come directly home from work," as he had always done before; and that she even called "Missing Persons" when he failed to return on the night in question. App. 8–10. Her testimony is not contradicted and certainly is credible. Without knowledge that he would commit such an act in the family car, or that he had ever done so previously, surely petitioner cannot be accused of failing to take "reasonable steps" to prevent the illicit behavior. She is just as blameless as if a thief, rather than her husband, had used the car in a criminal episode.

While the majority admits that this forfeiture is at least partly punitive in nature, it asserts that Michigan's law also serves a "deterrent purpose distinct from any punitive purpose." *Ante,* at 452. But that is no distinction at all; deterrence is itself one of the aims of punishment. *United States*

v. *Halper*, 490 U. S. 435, 448 (1989).[13]   Even on a deterrence rationale, moreover, that goal is not fairly served in the case of a person who has taken all reasonable steps to prevent an illegal act.

Forfeiture of an innocent owner's property that plays a central role in a criminal enterprise may be justified on reasoning comparable to the basis for imposing liability on a principal for an agent's torts.   Just as the risk of *respondeat superior* liability encourages employers to supervise more closely their employees' conduct, see *Arizona* v. *Evans*, 514 U. S. 1, 29, n. 5 (1995) (GINSBURG, J., dissenting), so the risk of forfeiture encourages owners to exercise care in entrusting their property to others, see *Calero-Toledo*, 416 U. S., at 687; *ante*, at 452.   But the law of agency recognizes limits on the imposition of vicarious liability in situations where no deterrent function is likely to be served; for example, it exonerates the employer when the agent strays from his intended mission and embarks on a "frolic of his own."   See also *United States* v. *Park*, 421 U. S. 658, 673 (1975) (vicarious criminal liability for corporate officer based on company's conduct impermissible if officer was "'powerless' to prevent or correct the violation") (citation omitted).   In this case, petitioner did not "entrust" the car to her husband on the night in question; he was entitled to use it by virtue of their joint ownership.   There is no reason to think that the threat

---

[13] For that reason, the majority's attempt to analogize this forfeiture to the system of tort liability for automobile accidents is unpersuasive.   See *ante*, at 452.   Tort law is tied to the goal of compensation (punitive damages being the notable exception), while forfeitures are concededly punitive.   The fundamental difference between these two regimes has long been established.   "The law never punishes any man criminally but for his own act, yet it frequently punishes him in his pocket, for the act of another.   Thus, if a wife commits an offence, the husband is not liable to the penalties; but if she obtains the property of another by any means not felonious, he must make the payment and amends."   *Phile* v. *Ship Anna*, 1 Dall. 197, 207 (C. P. Phila. Cty. 1787).   The converse, of course, is true as well.

of forfeiture will deter an individual from buying a car with her husband—or from marrying him in the first place—if she neither knows nor has reason to know that he plans to use it wrongfully.

The same is true of the second asserted justification for strict liability, that it relieves the State of the difficulty of proving collusion, or disproving the lack thereof, by the alleged innocent owner and the wrongdoer. See *ante*, at 452 (citing *Van Oster* v. *Kansas*, 272 U. S., at 467–468). Whatever validity that interest might have in another kind of case, it has none here. It is patently clear that petitioner did not collude with her husband to carry out *this* offense.

The absence of any deterrent value reinforces the punitive nature of this forfeiture law. But petitioner has done nothing that warrants punishment. She cannot be accused of negligence or of any other dereliction in allowing her husband to use the car for the wholly legitimate purpose of transporting himself to and from his job. She affirmatively alleged and proved that she is not in any way responsible for the conduct that gave rise to the seizure. If anything, she was a *victim* of that conduct. In my opinion, these facts establish that the seizure constituted an arbitrary deprivation of property without due process of law.[14]

---

[14] JUSTICE GINSBURG argues that Michigan should not be rebuked for its efforts to deter prostitution, see *ante*, at 457–458, but none of her arguments refutes the fact that the State has accomplished its ends by sacrificing the rights of an innocent person. First, the concession that the car itself may be confiscated provides no justification for the forfeiture of the co-owner's separate interest. Second, the assertion that the Michigan Supreme Court "stands ready to police exorbitant applications of the statute," *ibid.*, has a hollow ring because it failed to do so in this case. That court did not even mention the relevance of innocence to the trial court's exercise of its "equitable discretion." Rather, it stated flatly that "Mrs. Bennis' claim is without constitutional consequence." 447 Mich., at 741, 527 N. W. 2d, at 494. Third, the blatant unfairness of using petitioner's property to compensate for her husband's offense is not diminished by its modest value. It is difficult, moreover, to credit the trial court's statement that it would have awarded the proceeds of the sale to petitioner if

## III

The Court's holding today is dramatically at odds with our holding in *Austin* v. *United States*. We there established that when a forfeiture constitutes "payment to a sovereign as punishment for some offense"—as it undeniably does in this case—it is subject to the limitations of the Eighth Amendment's Excessive Fines Clause. For both of the reasons I have already discussed, the forfeiture of petitioner's half interest in her car is surely a form of "excessive" punishment. For an individual who merely let her husband use her car to commute to work, even a modest penalty is out of all proportion to her blameworthiness; and when the assessment is confiscation of the entire car, simply because an illicit act took place once in the driver's seat, the punishment is plainly excessive. This penalty violates the Eighth Amendment for yet another reason. Under the Court's reasoning, the value of the car is irrelevant. A brand-new luxury sedan or a 10-year-old used car would be equally forfeitable. We have held that "dramatic variations" in the value of conveyances subject to forfeiture actions undercut any argument that the latter are reasonably tied to remedial ends. See *Austin*, 509 U. S., at 621; *United States* v. *Ward*, 448 U. S. 242, 254 (1980).

I believe the Court errs today by assuming that the power to seize property is virtually unlimited and by implying that our opinions in *Calero-Toledo* and *Austin* were misguided. Some 75 years ago, when presented with the argument that the forfeiture scheme we approved had no limit, we insisted that expansive application of the law had not yet come to pass. "When such application shall be made," we said, "it will be time enough to pronounce upon it." *Goldsmith-*

---

they had been larger, for it expressly ordered that any remaining balance go to the State's coffers. See App. 28. Finally, the State's decision to deter "johns from using cars *they* own (or co-own) to contribute to neighborhood blight," *ante*, at 458 (emphasis added), surely does not justify the forfeiture of that share of the car owned by an innocent spouse.

*Grant Co.*, 254 U. S., at 512. That time has arrived when the State forfeits a woman's car because her husband has secretly committed a misdemeanor inside it. While I am not prepared to draw a bright line that will separate the permissible and impermissible forfeitures of the property of innocent owners, I am convinced that the blatant unfairness of this seizure places it on the unconstitutional side of that line.

I therefore respectfully dissent.

JUSTICE KENNEDY, dissenting.

The forfeiture of vessels pursuant to the admiralty and maritime law has a long, well-recognized tradition, evolving as it did from the necessity of finding some source of compensation for injuries done by a vessel whose responsible owners were often half a world away and beyond the practical reach of the law and its processes. See *Harmony* v. *United States*, 2 How. 210, 233 (1844); *Republic Nat. Bank of Miami* v. *United States*, 506 U. S. 80, 87–88 (1992). The prospect of deriving prompt compensation from *in rem* forfeiture, and the impracticality of adjudicating the innocence of the owners or their good-faith efforts in finding a diligent and trustworthy master, combined to eliminate the owner's lack of culpability as a defense. See *Harmony* v. *United States, supra,* at 233. Those realities provided a better justification for forfeiture than  earlier, more mechanistic rationales. Cf. *Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663, 680–681 (1974) (discussing deodands). The tradeoff, of course, was that the owner's absolute liability was limited to the amount of the vessel and (or) its cargo. For that reason, it seems to me inaccurate, or at least not well supported, to say that the owner's personal culpability was part of the forfeiture rationale. *Austin* v. *United States,* 509 U. S. 602, 625 (1993) (SCALIA, J., concurring in part and concurring in judgment); *id.,* at 628–629 (KENNEDY, J., concurring in part and concurring in judgment). As JUSTICE STEVENS observes, however, *ante,* at 466–467, even the well-recognized

tradition of forfeiture in admiralty has not been sufficient for an unequivocal confirmation from this Court that a vessel in all instances is seizable when it is used for criminal activity without the knowledge or consent of the owner, see *Calero-Toledo* v. *Pearson Yacht Leasing Co., supra,* at 688–690. Cf. *The William Bagaley,* 5 Wall. 377, 410–411 (1867) (discussing English cases holding knowledge or culpability relevant to the forfeiture of a cargo owner's interest).

We can assume the continued validity of our admiralty forfeiture cases without in every analogous instance extending them to the automobile, which is a practical necessity in modern life for so many people. At least to this point, it has not been shown that a strong presumption of negligent entrustment or criminal complicity would be insufficient to protect the government's interest where the automobile is involved in a criminal act in the tangential way that it was here. Furthermore, as JUSTICE STEVENS points out, *ante,* at 462–463, the automobile in this case was not used to transport contraband, and so the seizure here goes beyond the line of cases which sustain the government's use of forfeiture to suppress traffic of that sort.

This forfeiture cannot meet the requirements of due process. Nothing in the rationale of the Michigan Supreme Court indicates that the forfeiture turned on the negligence or complicity of petitioner, or a presumption thereof, and nothing supports the suggestion that the value of her co-ownership is so insignificant as to be beneath the law's protection.

For these reasons, and with all respect, I dissent.