# SUPREME COURT OF THE UNITED STATES

## LISA OLIVIA LEONARD *v.* TEXAS

ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
APPEALS OF TEXAS, NINTH DISTRICT

No. 16–122.　Decided March 6, 2017

The petition for a writ of certiorari is denied.

Statement of JUSTICE THOMAS respecting the denial of certiorari.

This petition asks an important question: whether modern civil-forfeiture statutes can be squared with the Due Process Clause and our Nation's history.

## I

Early in the morning on April 1, 2013, a police officer stopped James Leonard for a traffic infraction along a known drug corridor. During a search of the vehicle, the officer found a safe in the trunk. Leonard and his passenger, Nicosa Kane, gave conflicting stories about the contents of the safe, with Leonard at one point indicating that it belonged to his mother, who is the petitioner here. The officer obtained a search warrant and discovered that the safe contained $201,100 and a bill of sale for a Pennsylvania home.

The State initiated civil forfeiture proceedings against the $201,100 on the ground that it was substantially connected to criminal activity, namely, narcotics sales. See Tex. Code Crim. Proc. Ann., Art. 59.01 (Vernon Cum. Supp. 2016). The trial court issued a forfeiture order, and petitioner appealed. Citing the suspicious circumstances of the stop and the contradictory stories provided by Leonard and Kane, the Court of Appeals affirmed the trial court's conclusion that the government had shown by a preponderance of the evidence that the money was either the proceeds of a drug sale or intended to be used in such a

sale. It also affirmed the trial court's rejection of petitioner's innocent-owner defense. Petitioner had asserted that the money was not related to a drug sale at all, but was instead from a home she had recently sold in Pennsylvania. The court deemed this testimony insufficient to establish that she was in fact an innocent owner.

Petitioner now challenges the constitutionality of the procedures used to adjudicate the seizure of her property. In particular, she argues that the Due Process Clause required the State to carry its burden by clear and convincing evidence rather than by a preponderance of the evidence.

## II

Modern civil forfeiture statutes are plainly designed, at least in part, to punish the owner of property used for criminal purposes. See, *e.g., Austin* v. *United States*, 509 U. S. 602, 618–619 (1993). When a state wishes to punish one of its citizens, it ordinarily proceeds against the defendant personally (known as "*in personam*"), and in many cases it must provide the defendant with full criminal procedural protections. Nevertheless, for reasons discussed below, this Court permits prosecutors seeking forfeiture to proceed against the property (known as "*in rem*") and to do so civilly. See, *e.g., United States* v. *James Daniel Good Real Property*, 510 U. S. 43, 56–57 (1993). *In rem* proceedings often enable the government to seize the property without any predeprivation judicial process and to obtain forfeiture of the property even when the owner is personally innocent (though some statutes, including the one here, provide for an innocent-owner defense). Civil proceedings often lack certain procedural protections that accompany criminal proceedings, such as the right to a jury trial and a heightened standard of proof.

Partially as a result of this distinct legal regime, civil

forfeiture has in recent decades become widespread and highly profitable. See, *e.g.,* Institute for Justice, D. Carpenter, L. Knepper, A. Erickson, & J. McDonald, Policing for Profit: The Abuse of Civil Asset Forfeiture 10 (2d ed. Nov. 2015) (Department of Justice Assets Forfeiture Fund took in $4.5 billion in 2014 alone), https://ij.org/wp-content/uploads/2015/11/policing-for-profit-2nd-edition.pdf (as last visited Feb. 27, 2017). And because the law enforcement entity responsible for seizing the property often keeps it, these entities have strong incentives to pursue forfeiture. *Id.,* at 14 (noting that the Federal Government and many States permit 100 percent of forfeiture proceeds to flow directly to law enforcement); see also App. to Pet. for Cert. B–2 (directing that the money in this case be divided between the "Cleveland Police Department" and the "Liberty County District Attorney's Office").

This system—where police can seize property with limited judicial oversight and retain it for their own use— has led to egregious and well-chronicled abuses. According to one nationally publicized report, for example, police in the town of Tenaha, Texas, regularly seized the property of out-of-town drivers passing through and collaborated with the district attorney to coerce them into signing waivers of their property rights. Stillman, Taken, The New Yorker, Aug. 12 & 19, 2013, pp. 54–56. In one case, local officials threatened to file unsubstantiated felony charges against a Latino driver and his girlfriend and to place their children in foster care unless they signed a waiver. *Id.,* at 49. In another, they seized a black plant worker's car and all his property (including cash he planned to use for dental work), jailed him for a night, forced him to sign away his property, and then released him on the side of the road without a phone or money. *Id.,* at 51. He was forced to walk to a Wal-Mart, where he borrowed a stranger's phone to call his mother, who had to rent a car to pick him up. *Ibid.*

These forfeiture operations frequently target the poor and other groups least able to defend their interests in forfeiture proceedings. *Id.*, at 53–54; Sallah, O'Harrow, & Rich, Stop and Seize, Washington Post, Sept. 7, 2014, pp. A1, A10. Perversely, these same groups are often the most burdened by forfeiture. They are more likely to use cash than alternative forms of payment, like credit cards, which may be less susceptible to forfeiture. And they are more likely to suffer in their daily lives while they litigate for the return of a critical item of property, such as a car or a home.

### III

The Court has justified its unique constitutional treatment of civil forfeiture largely by reference to a discrete historical practice that existed at the time of the founding. See, *e.g., Bennis* v. *Michigan*, 516 U. S. 442, 446–448 (1996). "'English Law provided for statutory forfeitures of offending objects used in violation of the customs and revenue laws.'" *Austin, supra*, at 612 (quoting *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 682 (1974)). This practice "took hold in the United States," where the "First Congress passed laws subjecting ships and cargos involved in customs offenses to forfeiture." 509 U. S., at 613. Other early statutes also provided for the forfeiture of pirate ships. *United States* v. *Parcel of Rumson, N. J., Land*, 507 U. S. 111, 119 (1993) (plurality opinion). These early statutes permitted the government to proceed *in rem* under the fiction that the thing itself, rather than the owner, was guilty of the crime. See *Calero-Toledo*, *supra*, at 684–685; Act of Aug. 4, 1790, §67, 1 Stat. 176–177. And, because these suits were *in rem* rather than *in personam*, they typically proceeded civilly rather than criminally. See *United States* v. *La Vengeance*, 3 Dall. 297, 301 (1796).

In the absence of this historical practice, the Constitu-

tion presumably would require the Court to align its distinct doctrine governing civil forfeiture with its doctrines governing other forms of punitive state action and property deprivation. See *Bennis*, *supra*, at 454 (THOMAS, J., concurring) ("One unaware of the history of forfeiture laws and 200 years of this Court's precedent regarding such laws might well assume that such a scheme is lawless—a violation of due process"). I am skeptical that this historical practice is capable of sustaining, as a constitutional matter, the contours of modern practice, for two reasons.

First, historical forfeiture laws were narrower in most respects than modern ones. Cf. *James Daniel Good*, 510 U. S., at 85 (THOMAS, J., concurring in part and dissenting in part) (noting that "ambitious modern statutes and prosecutorial practices have all but detached themselves from the ancient notion of civil forfeiture"). Most obviously, they were limited to a few specific subject matters, such as customs and piracy. Proceeding *in rem* in those cases was often justified by necessity, because the party responsible for the crime was frequently located overseas and thus beyond the personal jurisdiction of United States courts. See Herpel, Toward a Constitutional Kleptocracy: Civil Forfeiture in America, 96 Mich. L. Rev. 1910, 1918–1920 (1998); see also *id.,* at 1925–1926 (arguing that founding-era precedents do not support the use of forfeiture against purely domestic offenses where the owner is plainly within the personal jurisdiction of both state and federal courts). These laws were also narrower with respect to the type of property they encompassed. For example, they typically covered only the instrumentalities of the crime (such as the vessel used to transport the goods), not the derivative proceeds of the crime (such as property purchased with money from the sale of the illegal goods). See *Rumson*, *supra*, at 121–122, 125 (plurality opinion) (Forfeiture of criminal proceeds is a modern innovation).

Second, it is unclear whether courts historically permit-

ted forfeiture actions to proceed civilly in all respects. Some of this Court's early cases suggested that forfeiture actions were in the nature of criminal proceedings. See, *e.g., Boyd* v. *United States*, 116 U. S. 616, 633–634 (1886) ("We are . . . clearly of [the] opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal"); but see R. Waples, Treatise on Proceedings *In Rem* 29–30 (1882) (collecting contrary authorities). Whether forfeiture is characterized as civil or criminal carries important implications for a variety of procedural protections, including the right to a jury trial and the proper standard of proof. Indeed, as relevant in this case, there is some evidence that the government was historically required to prove its case beyond a reasonable doubt. See *United States* v. *Brig Burdett*, 9 Pet. 682, 690 (1835) ("The object of the prosecution against the Burdett is to enforce a forfeiture of the vessel, and all that pertains to it, for a violation of a revenue law. This prosecution then is a highly penal one, and the penalty should not be inflicted, unless the infractions of the law shall be established beyond reasonable doubt").

IV

Unfortunately, petitioner raises her due process arguments for the first time in this Court. As a result, the Texas Court of Appeals lacked the opportunity to address them in the first instance. I therefore concur in the denial of certiorari. Whether this Court's treatment of the broad modern forfeiture practice can be justified by the narrow historical one is certainly worthy of consideration in greater detail.