# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Jimmy A. Richardson, II, Solicitor for the 15th Judicial Circuit, on behalf of the 15th Circuit Drug Enforcement Unit, Appellant,

v.

Twenty Thousand Seven Hundred Seventy-One and 00/100 Dollars ($20,771.00), U.S. Currency and Travis Green, Respondents.

Appellate Case No. 2020-000092

———————

Appeal from Horry County
Steven H. John, Circuit Court Judge

———————

Opinion No. 28113
Heard January 13, 2021 – Filed September 14, 2022

———————

## REVERSED AND REMANDED

———————

James Richard Battle II, of Battle Law Firm, LLC, of Conway, for Appellant.

Benjamin Alexander Hyman, of The Hyman Law Group, P.A., of Conway, and Daniel L. Alban and Robert Frommer, both of Arlington, VA, for Respondent.

Susan King Dunn and Shirene Carole Hansotia, both of Charleston; Jeremiah Williams and Jonathan Ference-Burke, both of Washington, DC; Caitlin M. Giaimo, Amreeta Susy Mathai, Olga Akselrod, Rodkangyil O. Danjuma, and Leah M. Watson, all of New York, NY; and

Jay Curran and Michael Hanify, both of Boston, MA, for Amici Curiae American Civil Liberties Union Foundation, American Civil Liberties Union of South Carolina Foundation, National Federation of Independent Business, The South Carolina Appleseed Legal Justice Center, South Carolina for Criminal Justice Reform, Root & Rebound, and Project Not a Statistic.

Jeffrey P. Dunlaevy, of Dunlaevy Law Firm, of Greenville, and Robert Daniel Alt and Jay R. Carson, both of Columbus, OH, for Amici Curiae The Buckeye Institute and Americans for Prosperity Foundation – South Carolina.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General W. Jeffrey Young, Solicitor General Robert D. Cook, Deputy Assistant Attorney General Harley Littleton Kirkland, and Assistant Attorney General Leon David Leggett III, all of Columbia, for Amicus Curiae Attorney General Alan Wilson.

Alan D. Clemmons, of Clemmons Law Firm, LLC, of Myrtle Beach, and Daniel C. Posner and Ari M. Herbert, both of Los Angeles, CA, for Amici Curiae The Southern Poverty Law Center and the National Police Accountability Project.

_____

**JUSTICE JAMES:**  Travis Green presents a facial challenge to our civil asset forfeiture statutory scheme following law enforcement's seizure of cash and contraband during the execution of a search warrant.  The circuit court concluded sections 44-53-520 and -530 of the South Carolina Code (2018) are facially unconstitutional under both the Excessive Fines Clause and the Due Process Clause of the federal and state constitutions.  We reverse the circuit court and remand for a jury trial on the merits.

# Background

In the fall of 2017, the Fifteenth Circuit Drug Enforcement Unit ("police" or "law enforcement") received information that Green was selling narcotics in the Myrtle Beach area. Police used a confidential informant to conduct three drug buys; in those buys, Green sold the informant approximately 28 grams of cocaine for a total of $1,400. Law enforcement subsequently obtained an arrest warrant for Green and a search warrant for his residence. During the execution of these warrants, police seized 132 grams of crack cocaine; 32 grams of cocaine; 319 grams of marijuana; 27 Morphine tablets; $20,771 in U.S. Currency ($971 from Green's wallet, and $19,800 from an outdoor garage closet); and two digital scales with white powder residue. Officers charged Green with seven counts of various drug offenses, and about a year later, he pled guilty to distribution of cocaine, 2nd offense, and possession with intent to distribute marijuana, 1st offense. Green was sentenced to concurrent prison terms of fifteen years on the cocaine charge and five years on the marijuana charge.

Eight days after Green's arrest, the Solicitor[1] filed a forfeiture petition in the court of common pleas seeking an order forfeiting the $20,771 seized. Green was served and answered the petition. He admitted to the amount of cash seized and requested dismissal or, alternatively, a jury trial. The circuit court requested the parties to brief the relevance of *Timbs v. Indiana*, 139 S. Ct. 682 (2019), and the constitutionality of our statutory civil forfeiture scheme. Thereafter, the circuit court determined sections 44-53-520 and -530 violated both the federal and state constitutions. Specifically, the circuit court concluded these two provisions facially violated (1) the Due Process Clause in the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 3 of the South Carolina Constitution and (2) the Excessive Fines Clause in the Eighth Amendment to the United States Constitution and Article I, Section 15 of the South Carolina Constitution. In dismissing the action, the circuit court held sections 44-53-520 and -530 facially violated due process by placing a burden on the property owner to prove he is an innocent owner, institutionally incentivizing officials to pursue forfeiture actions, and failing to provide for judicial review or authorization prior to or subsequent to the seizure. The circuit court denied the Solicitor's motion for reconsideration, and the Solicitor appealed.

---

[1] Appellant contracts with a private law firm to pursue forfeiture actions. For ease of reference, we refer to Appellant as "the Solicitor."

**Issues**

I.   Did the circuit court err in determining that sections 44-53-520 and -530 are facially unconstitutional because they violate the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 3 of the South Carolina Constitution?

II.  Did the circuit court err in determining that sections 44-53-520 and -530 are facially unconstitutional because they violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution and Article I, Section 15 of the South Carolina Constitution?

**Standard of Review**

Our precedent imposes a high threshold for finding a statute unconstitutional. "All statutes are presumed constitutional and will, if possible, be construed so as to render them valid." *State v. Harrison*, 402 S.C. 288, 292-93, 741 S.E.2d 727, 729 (2013). Stated differently, "A legislative enactment will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates a provision of the constitution." *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999). We begin by presuming the validity of our statutory scheme governing civil forfeitures. Because Green chose to assert a facial challenge and not an as-applied challenge, he must demonstrate this scheme is unconstitutional in all its applications. *Knotts v. S.C. Dep't of Nat. Res.*, 348 S.C. 1, 6, 558 S.E.2d 511, 513 (2002) (noting the party asserting a constitutional challenge bears the burden); *State v. Legg*, 416 S.C. 9, 13-14, 785 S.E.2d 369, 371 (2016) ("A facial challenge is 'the most difficult . . . to mount successfully,' as it requires the challenger show the legislation at issue is unconstitutional in all its applications." (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015))). Thus, "[u]nless the statute is unconstitutional in all its applications, an as-applied challenge must be used to attack its constitutionality." *Travelscape, LLC v. S.C. Dep't of Revenue*, 391 S.C. 89, 109 n.11, 705 S.E.2d 28, 39 n.11 (2011) (quoting *Williams v. Pryor*, 240 F.3d 944, 953 (11th Cir. 2001)).

These principles guide us as we navigate the waters of constitutionality, and as we recently acknowledged, "We begin our analysis . . . with the fundamental, firmly-established principle that 'in the General Assembly rests plenary legislative power, limited only by the constitutions, State and Federal. Legislation not expressly or impliedly inhibited by one or the other of these documents may be validly enacted.'" *Pinckney v. Peeler*, 434 S.C. 272, 285, 862 S.E.2d 906, 913 (2021)

(quoting *Ashmore v. Greater Greenville Sewer Dist.*, 211 S.C. 77, 96, 44 S.E.2d 88, 97 (1947)).

## Discussion

Our civil asset forfeiture statutes originate from the Uniform Controlled Substances Act of 1970. *See* 21 U.S.C. § 881; David R. Fine, *Bennis v. Michigan and Innocent Owners in Civil Forfeiture: Balancing Legitimate Goals with Due Process and Reasonable Expectations*, 5 Geo. Mason L. Rev. 595, 605 & n.91 (1997). Forty-eight states adopted this model statute, which was created by the National Conference of Commissioners on Uniform State Laws. Although our statutory scheme essentially implemented the comparable federal scheme, the earliest tenets of civil asset forfeiture date back to biblical times and were expanded during the early English common law period. *See Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680-83 (1974) (recounting a brief history of civil asset forfeiture).

Here, the circuit court ruled two statutes in our civil forfeiture scheme violate due process: (1) section 44-53-520, which lists the property subject to seizure and the process for law enforcement to make a seizure, and (2) section 44-53-530, which sets forth the process for the solicitor to carry out a forfeiture and disburse forfeited property. Significantly, this statutory scheme is civil in nature. *See Mims Amusement Co. v. S.C.L. Enf't Div.*, 366 S.C. 141, 150 n.4, 621 S.E.2d 344, 348 n.4 (2005) ("The critical difference between civil forfeiture and criminal forfeiture is the identity of the defendant." (quoting *United States v. Croce*, 345 F. Supp. 2d 492, 494 (E.D. Pa. 2004))). In civil forfeiture proceedings, the state proceeds against a thing (rem) whereas in criminal forfeiture, it proceeds against a human being (personam). *Id.* Our forfeiture statutes address two types of property: (1) contraband per se, which is property illegal to possess (such as cocaine, heroin, and other illegal narcotics), and (2) derivative contraband, which is property normally legal to possess (such as cash or vehicles) but which becomes contraband when used for illegal purposes. *Id.* at 149-50, 621 S.E.2d at 348.

After the solicitor commences forfeiture proceedings, "[n]otice of hearing or rule to show cause must be directed to all persons with interests in the property listed in the petition[.]" § 44-53-530(a). At the hearing, the State has the initial burden of demonstrating "it had probable cause for believing a substantial connection exists between the property to be forfeited and the criminal activity." *Gowdy v. Gibson*, 391 S.C. 374, 379, 706 S.E.2d 495, 497 (2011). If the State meets this threshold, the burden shifts to the property owner "to show by a preponderance of the evidence that the property was innocently owned." *Id.* at 379, 706 S.E.2d at 497-98. If the

circuit court grants the petition, the first $1,000 of forfeited cash goes to the law enforcement agency that effected the seizure. § 44-53-530(f). All cash above $1,000 is distributed as follows: (1) 75% to the law enforcement agency, (2) 20% to the prosecuting agency, and (3) 5% to the State Treasurer. § 44-53-530(e). Vehicles, boats, equipment, and real property that are not reduced to proceeds go to the law enforcement agency or prosecuting agency. *See* § 44-53-530(a). Sections 44-53-520 and -530 also limit how forfeiture proceeds may be used, including that they may not be used for personal use. *See, e.g.*, § 44-53-520(k). Law enforcement may use forfeited money only for "drug enforcement activities, or for drug or other law enforcement training or education." § 44-53-530(g). We now turn to the merits of the parties' constitutional arguments.

## I.      Due Process

The Solicitor contends the circuit court erred in determining that sections 44-53-520 and -530 violate due process under the federal and state constitutions. The circuit court concluded these two sections violated due process by: (1) placing a burden on the property owner to prove he is an innocent owner, (2) institutionally incentivizing officials to pursue forfeiture actions, and (3) failing to provide for judicial review or authorization prior to or subsequent to the seizure. In reaching this decision, the circuit court applied the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The *Mathews* test examines the procedural due process of a legal proceeding by considering: (1) the private interest affected by the proceeding; (2) the risk of error created by the chosen procedure; and (3) the countervailing governmental interest supporting the challenged procedure. Though we agree with the circuit court that the *Mathews* test applies, we conclude sections 44-53-520 and -530 do not violate due process. We now address each factor of the *Mathews* test as it applies to the circuit court's ruling.

### A. Burden to Prove Innocent Ownership

The Solicitor argues the circuit court erred in finding that our statutory scheme unconstitutionally places the burden on a defendant to prove the items seized were not connected to criminal activity—in other words, that the seized items are not derivative contraband. Green asserts the circuit court properly found the burden component placed an unacceptable risk that forfeiture proceedings will be used to punish innocent parties. He contends that because the government's initial burden is low, the risk is simply too great that an innocent person will be unable to regain his property in a forfeiture proceeding. Although Green raises legitimate concerns with the practical effect of our forfeiture scheme, we do not believe he satisfies the high threshold for establishing the facial unconstitutionality of a statute.

There is no dispute that an individual has a legitimate interest in his property; thus, the first *Mathews* factor weighs in favor of Green. The parties disagree, however, on the outcome of the second and third *Mathews* factors. Concerning the second factor, the Solicitor contends the statutory scheme sufficiently guards against an unconstitutional risk of erroneous deprivation of property. Green argues the State's low initial probable cause burden, combined with the lack of the property owner's right to appointed counsel, renders the risk of erroneous deprivation too great.

It is clear the State has the initial burden of establishing probable cause that the seized items are substantially connected to a criminal purpose. *Gowdy*, 391 S.C. at 379, 706 S.E.2d at 497. While this burden is low, this does not render the entire statute facially unconstitutional. Likewise, the burden-shifting provision in the statute does not render the entire statute facially unconstitutional. The burden-shifting aspect is in keeping with similar statutory schemes across the country, though some state statutes require a heightened preponderance of the evidence standard. *See State v. Timbs*, 134 N.E.3d 12, 27 n.6 (Ind. 2019) ("Many jurisdictions impose comparable burdens, though some state statutes impose more stringent requirements on the government."). Historically, this burden-shifting paradigm tracked federal law, which initially imposed only a probable cause burden on the government before Congress elevated the burden to a preponderance of the evidence. *See State v. Bergstrom*, 710 N.W.2d 407, 412 & n.1 (N.D. 2006) (explaining that North Dakota includes a burden-shifting mechanism once the state establishes probable cause and noting this scheme is identical to the federal law that existed before Congress raised the government's burden to a preponderance of the evidence).

Additionally, the General Assembly has codified other protections designed to guard against an erroneous deprivation of property. Although law enforcement may immediately seize suspected items, the solicitor must file a forfeiture petition within a reasonable period of time thereafter. § 44-53-530(a). The forfeiture petition serves to notify all interested persons that the solicitor intends to seek forfeiture of the seized items. Those with an interest in the seized property are entitled to a jury trial in which they can cross-examine the State's witnesses and present evidence if they choose. *Medlock v. 1985 Ford F-150 Pick Up*, 308 S.C. 68, 72, 417 S.E.2d 85, 87 (1992) (holding that "defendant owners possess a right to a jury trial where the property subject to forfeiture under sections 44-53-520 and -530 is property normally used for lawful purposes").

The circuit court relied on two decisions in finding the burden-shifting component violates due process—*Nelson v. Colorado*, 137 S. Ct. 1249 (2017), and *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145 (D.N.M. 2018). We do not

believe either decision compels a finding that Green has overcome the presumption of constitutional validity. The statute addressed in *Nelson* did not involve forfeitures; instead, it involved the recoupment of costs associated with a subsequently overturned criminal conviction. Indeed, at least one other state supreme court has determined *Nelson* does not apply in a forfeiture proceeding. *See Commonwealth v. Martinez*, 109 N.E.3d 459, 475-76 (Mass. 2018) (noting *Nelson*, which concerned criminal matters, does not apply to civil forfeiture proceedings). Further, unlike our forfeiture scheme, the statute in *Nelson* placed the initial burden on the individual and did not require the government to make any showing to retain the costs.

Additionally, *Harjo* appears to be an outlier in this arena. In *Harjo*, the New Mexico federal district court found an Albuquerque ordinance allowing vehicle seizures violated due process. The ordinance allowed law enforcement to seize a vehicle if it was operated by a person arrested for his second driving while intoxicated offense. When a vehicle was seized, the owner had ten days to pay a $50 fee and request an administrative hearing. If the owner did not request a hearing, the vehicle was deemed abandoned and sold at auction (i.e., automatically forfeited). The district court held placing the burden of proof on an innocent owner created "such a risk of erroneous deprivation that it violate[d] procedural due process." 326 F. Supp. 3d at 1207. The district court also found that treating the seized vehicle as a defendant was constitutionally inadequate because it did not require the city to prove anything about the owner. *Id.* at 1208. ("[P]roving that the City of Albuquerque has probable cause to seize a vehicle does not reveal anything about what the vehicle's owner could or could not have reasonably foreseen.").

Notwithstanding *Harjo*, numerous courts, as well as ours, have upheld civil forfeiture statutes. *See, e.g.*, *Bennis v. Michigan*, 516 U.S. 442, 446 (1996) ("[A] long and unbroken line of cases holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to such use."); *Logan v. United States*, 260 F. 746, 748-49 (5th Cir. 1919) ("The long history of forfeitures in this country . . . repels the idea that such forfeitures conflict with the owner's right to due process of law."); *Myers v. 1518 Holmes St.*, 306 S.C. 232, 237, 411 S.E.2d 209, 212 (1991) (upholding our civil asset forfeiture scheme in the face of a due process challenge). The utter dearth of case law invalidating these statutes based on a facial challenge is telling because nearly every state currently has some form of civil asset forfeiture. This lack of case law supports the notion that our scheme is not facially invalid, <u>especially</u> given the threshold presumption of constitutional validity. *Weaver v. Recreation Dist.*, 431 S.C. 357, 363, 848 S.E.2d 760, 762 (2020) ("A possible constitutional

construction must prevail over an unconstitutional interpretation." (quoting *State v. Neuman*, 384 S.C. 395, 402, 683 S.E.2d 268, 271 (2009))). Accordingly, though Green may prefer a heightened standard, that decision is for the General Assembly to make, not this Court.

As to the third *Mathews* factor—the countervailing governmental interest supporting the challenged procedure—the Solicitor argues civil asset forfeiture prevents public harm by deterring further illicit use of the property and imposing an economic penalty. Green asserts the government has no interest in depriving an individual of property when that individual is not personally culpable, even if the property was connected to criminal activity.

We have held civil asset forfeiture is a legitimate exercise of the State's police powers. *Myers*, 306 S.C. at 235, 411 S.E.2d at 211 ("We find that forfeiture is directed to the prevention of serious public harm, and is within the legitimate exercise of the police power."). We have also concluded "forfeiture serves a deterrent purpose both by preventing the further illicit use of the property and by imposing an economic penalty, thereby rendering the illegal behavior unprofitable." *Mims Amusement Co.*, 366 S.C. at 147, 621 S.E.2d at 347. Accordingly, the government has a strong, legitimate interest in forfeiting property connected to criminal activity. Nevertheless, Green advances a narrower argument—that the government does not have an interest in depriving an innocent person of his property. If the property is not connected to criminal activity, Green's remedy under our statutory scheme is to contest the forfeiture. *See Pope v. Gordon*, 369 S.C. 469, 476, 633 S.E.2d 148, 152 (2006) (affirming the court of appeals' holding that the State failed to satisfy its initial burden of probable cause where law enforcement seized $25,341.09 from the defendant's bank account in connection with a drug trafficking charge because the defendant owned a legitimate car detailing business and bank records demonstrated the seized money was not substantially connected to illegal drug activity). Even if seized property is connected to criminal activity but the owner is innocent, the circuit court must weigh that fact in determining whether forfeiture would violate the owner's constitutional rights. In other words, the appropriate challenge in such a case would be an as-applied challenge. As one state supreme court has noted, "because the procedural due process balancing under *Mathews* is so fact-intensive, it makes sense that in most cases asserting a due process violation based on a deprivation of property . . . a constitutional challenge will and should be decided on an as-applied basis." *Olson v. One 1999 Lexus*, 924 N.W.2d 594, 607 n.8 (Minn. 2019).

We acknowledge some courts and many commentators have criticized the fairness of civil asset forfeiture laws, specifically addressing burden shifting and the

potential for an innocent owner to lose his property. In response, several states have amended their statutory schemes to impose more stringent requirements on the government; however, the fact that certain states have legislatively altered their civil forfeiture laws provides no support for judicially changing ours. Legislative alteration might be a good thing, but we are not called upon to decide whether a change in the law would be wise. We are instead called upon to decide whether these statutes are facially unconstitutional. In doing so, we cannot encroach upon the General Assembly's constitutional exercise of legislative power.[2]

### B. Incentivization to Pursue Forfeiture Actions

The circuit court also ruled sections 44-53-520 and -530 are facially unconstitutional because they incentivize officials to commence forfeiture actions. The circuit court based this conclusion on the percentage allocations of forfeiture proceeds set forth in section 44-53-530(e). The Solicitor contends the circuit court improperly weighed into legislative policy decisions and erroneously assumed certain facts in concluding the financial incentive to pursue forfeiture overcomes the presumption of constitutional validity. Green contends the statutory scheme imposes an unconstitutional incentive because the majority of forfeited property is retained by law enforcement and the prosecuting agency.

It is a fundamental tenet of due process that a person is entitled "to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). This neutrality requirement "safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process." *Id.* Additionally, impartiality serves to promote "both the appearance and reality of fairness[.]" *Id.*

---

[2] In addition to finding sections 44-53-520 and 530 do not facially violate the federal constitution, we find these provisions do not facially violate the state constitution. We disagree with the dissent that article I, section 4 of our state constitution is implicated in the first instance, as sections 44-53-520 and 530 do not impose an automatic forfeiture. Although law enforcement may immediately seize items subject to potential forfeiture, and while the statute deems forfeiture occurs at the moment of illegal use, our statutory scheme permits interested parties to contest the forfeiture, and a court, not law enforcement or a solicitor, ultimately determines whether the seized items are permanently forfeited.

Here, the circuit court relied on *Flora v. Southwest Iowa Narcotics Enforcement Task Force*, 292 F. Supp. 3d 875 (S.D. Iowa 2018), to support its conclusion that sections 44-53-520 and -530 are facially invalid. However, a close reading of *Flora* reveals the district court <u>upheld</u> Iowa's forfeiture statute under a similar facial challenge because the challenger could not demonstrate the funding scheme was unconstitutional in all circumstances. *Id.* at 905-06. Nor can Green.

While the percentage allocations in subsection 44-53-530(e) might cast a shadow on the fairness of any given civil asset forfeiture, this is not enough to overcome the strong presumption of constitutional validity that envelops Green's facial challenge. Some of the facts relied upon by the circuit court appear to track the analysis in *Harjo*.[3] However, as we previously noted, the decision in *Harjo* was an outlier. Moreover, the *Harjo* court was presented with a full record containing depositions and other evidence. The precise point at which a funding scheme tips the scales toward a finding of unconstitutionality is at best blurry and is factually dependent. *Compare Rose v. Vill. of Peninsula*, 875 F. Supp. 442, 451 (N.D. Ohio 1995) (stating the annual collection of funds amounting to more than 10% of a city's general revenue was "substantial"), *with Wolkenstein v. Reville*, 694 F.2d 35, 43 (2d Cir. 1982) (finding fees imposed sporadically or occasionally and representing slightly more than 0.5% of the budget were not substantial). Overall, the record before us lacks the foundation sufficient for this Court to facially invalidate our civil asset forfeiture scheme.

### C. Pre-Seizure or Post-Seizure Hearing

---

[3] The circuit court concluded that (1) forfeiture revenues in each agency are directed to a designated special revenue fund; (2) this fund is used to pay expenses directly associated with the forfeiture program, to pay for discretionary items that would otherwise be unavailable to law enforcement agencies, and to pay for recurring expenses, creating a secondary budget within each agency that is not subject to legislative approval and that results in agency dependence on forfeiture funds; (3) the existence of forfeiture programs in each agency depends on the revenue generated by forfeitures; (4) forfeiture revenue is used to justify the salaries of forfeiture officials, and declines in that revenue may require termination of such officials; (5) declines in forfeiture revenue will require the elimination of significant discretionary spending; and (6) in practice, officials involved in forfeiture programs control how income is budgeted and spent with little to no legislative oversight. The record before us does not provide sufficient detail to support these findings.

The Solicitor contends the circuit court erred in finding sections 44-53-520 and -530 facially invalid for lack of provisions allowing for a pre-seizure or prompt post-seizure hearing. Green asserts the circuit court correctly determined these provisions were facially invalid because the current statutory scheme does not provide a timely, meaningful review. We agree with the Solicitor.

Due process requires notice, an opportunity to be heard, and an opportunity for judicial review. *Kurschner v. City of Camden Plan. Comm'n*, 376 S.C. 165, 171, 656 S.E.2d 346, 350 (2008). As for a pre-seizure hearing, we reiterate what this Court stated thirty years ago—a pre-seizure hearing is not required to pass constitutional muster. *Myers*, 306 S.C. at 236, 411 S.E.2d at 212 ("We find no authority that seizure of real property requires *pre*-seizure notice and hearing."). Turning to whether the current post-seizure hearing provisions are sufficient, both subsections 44-53-520(c) and -530(a) require that a forfeiture proceeding be commenced "within a reasonable time." By requiring the solicitor to commence proceedings within a reasonable time, the General Assembly has balanced an owner's right to reclaim his property with the government's desire to obtain forfeiture of contraband. Although "reasonable time" is not defined, due process does not require perfect process or even the best process. *See generally id.* ("[C]ourts have consistently held that *post*-seizure procedures are sufficient."). Our inquiry does not turn on whether we think the law should impose a <u>specific</u> time period, as that is a policy question for the General Assembly.

Moreover, if a state official fails to timely commence forfeiture proceedings, that failure is a defect involving a particular seizure and should be redressed in that particular case, but it does not allow us to hold the statutory scheme is unconstitutional under all its applications. *Legg*, 416 S.C. at 13-14, 785 S.E.2d at 371. In such a case, a property owner may bring his or her own action based on an innocent owner defense. Accordingly, the circuit court erred in facially invalidating sections 44-53-520 and -530 based on the absence of provisions requiring a pre-seizure or prompt post-seizure hearing.

## II. Excessive Fines Clause

The Solicitor argues the circuit court erred in concluding sections 44-53-520 and -530 facially violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution and Article I, Section 15 of the South Carolina Constitution. Green contends sections 44-53-520 and -530 authorize forfeiture absent a showing of personal culpability, meaning any forfeiture would be excessive. We agree with the Solicitor.

The Excessive Fines Clause applies in a civil forfeiture proceeding. *See Austin v. United States*, 509 U.S. 602, 604 (1993) (holding the Excessive Fines Clause applies to forfeiture proceedings brought under federal law); *Timbs*, 139 S. Ct. at 687 ("The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment."). However, the circuit court's conclusion that our statutory scheme does not survive *Timbs* was error. The Supreme Court in *Timbs* concluded the Excessive Fines Clause applies to states by virtue of the Due Process Clause of the Fourteenth Amendment. *Timbs* did not categorically bar civil asset forfeiture or render any statute unconstitutional; instead, it dealt with incorporation under the Fourteenth Amendment. Because a claim that forfeiture violates the Excessive Fines Clause is inherently fact-intensive, it fits well within the scope of an as-applied challenge, not within the scope of a facial challenge.

In its order, the circuit court set forth a hypothetical scenario in which law enforcement could seize unlimited amounts of money and subject the money to forfeiture. That hypothetical is a classic example of why, under the proper set of facts, an as-applied challenge to the forfeiture statutes—not a facial challenge— would be appropriate. Just as one could hypothetically envision unlimited amounts of money or multiple vehicles being subject to forfeiture, other scenarios would most certainly survive a constitutional challenge, such as the forfeiture of a smaller amount of cash connected to selling contraband.

The circuit court's hypothetical does raise the issue of the proper test for determining when a seizure constitutes an excessive fine. We currently use the *Medlock* test, and both parties request we update this test to better align with current Supreme Court jurisprudence. Under *Medlock*, the court must weigh "(1) the nexus between the offense and the property and the extent of the property's role in the offense, (2) the role and culpability of the owner, and (3) the possibility of separating offending property that can readily be separated from the remainder." 322 S.C. at 132, 470 S.E.2d at 377. Following *Medlock*, the Supreme Court determined that a forfeiture violates the Excessive Fines Clause "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Accordingly, we follow numerous other courts that have updated their tests for whether a forfeiture constitutes an excessive fine, and we modify the *Medlock* test to expressly require an inquiry into whether a forfeiture is grossly disproportionate to the underlying criminal offense. *See, e.g.*, *Timbs*, 134 N.E.3d at 26 (citing several cases for the proposition that "courts deciding this issue have almost uniformly held that the Excessive Fines Clause includes a proportionality limitation"). However, because proportionality is equally as fact-intensive as the

traditional *Medlock* test, we decline to provide additional factors for courts to consider when analyzing proportionality.

## Conclusion

An undercurrent of this case is Green's claim that the civil forfeiture process is ripe for abuse. To an extent, this is true of any legal proceeding—civil or criminal. In the civil forfeiture arena, solicitors who commence forfeiture proceedings are entrusted with the solemn duty to pursue relief in accordance with the law. If abuse occurs in <u>any</u> legal proceeding, including civil forfeiture cases, our circuit courts are capable of ruling accordingly. We encourage our circuit courts to continue very careful examination of the issues presented in civil forfeiture proceedings.[4] Of course, if the General Assembly believes our state's civil asset forfeiture laws should be amended to address the potential for abuse or be updated to align more closely with federal law, it may do so. In the case before us, however, we reverse the circuit court's order because Green failed to overcome the high threshold for finding a statute facially unconstitutional.

Green has answered the Solicitor's petition and demanded a jury trial. The circuit court considered and ruled upon the constitutionality of the forfeiture statutes in the very early stages of this litigation. We remand this case to the circuit court for further proceedings.

**REVERSED AND REMANDED.**

**KITTREDGE, HEARN and FEW, JJ., concur. BEATTY, C.J., concurring in part and dissenting in part in a separate opinion.**

---

[4] The facts before may well present a textbook case for the proper—and uncontroversial—application of the forfeiture statutes. Green was convicted of distribution of cocaine, 2nd offense, and possession of marijuana with the intent to distribute, and Green does not contend the solicitor did not comply with the statutes. A common criticism in forfeiture proceedings is the solicitor's implicit merging of the criminal case with the civil forfeiture proceeding and leveraging one proceeding against the other. To be sure, there may be situations in which an innocent owner faces unnecessary delays and hurdles in reclaiming possession of seized property. We express no opinion as to whether any of those concerns are present here, and we certainly do not express an opinion as to whether Green was an innocent owner of the seized cash.

**CHIEF JUSTICE BEATTY:**  The Solicitor challenges a circuit court order finding South Carolina's civil forfeiture statutes[5] are facially unconstitutional because they violate provisions in the state and federal constitutions concerning (1) due process and (2) excessive fines.  Today, the majority reverses the circuit court on both findings.  I respectfully concur in part and dissent in part, as I would affirm the circuit court's ruling regarding due process.  I agree with the circuit court that the current statutory scheme places an undue burden on property owners, many of whom are never charged with a crime, to prove they are not guilty of any wrongdoing in order to reclaim their property.  This procedure is premised on the antiquated legal fiction that the in rem action is against the property itself and not the property owner, thereby depriving individuals of many of the safeguards that have historically protected their fundamental property interests.  I will address the circuit court's rulings in reverse order from the majority, as I will first summarize the points where I concur with the majority, before focusing on the points where I differ.

## I.  EXCESSIVE FINES

The circuit court concluded the statutes violate the prohibitions on excessive fines by permitting the government to seize unlimited amounts of cash and other property without regard to the proportionality of the crime that may have been committed.  *See* U.S. Const. amend. VIII; S.C. Const. art. I, § 15.  I agree with the majority that the Excessive Fines Clause of the Eighth Amendment applies to the states; that Green has not proven his contention the civil forfeiture statutes facially violate the prohibitions on excessive fines in the state and federal constitutions; and that Green's contention is more appropriate for an as-applied challenge to the statutes, which Green did not allege here.  Green's contention of excessiveness inherently requires a fact-specific analysis that goes beyond a facial challenge to the validity of the statutes.  *See generally Doe v. State*, 421 S.C. 490, 502, 808 S.E.2d 807, 813 (2017) ("[I]n analyzing a facial challenge to the constitutional validity of a statute, a court 'considers only the text of the measure itself and not its application to the particular circumstances of an individual.'" (quoting 16 C.J.S. *Constitutional Law* § 163, at 161 (2015))).  As a result, Green has not established, in this proceeding, that the statutes violate the constitutional prohibitions on excessive fines.

---

[5] *See* S.C. Code Ann. §§ 44-53-520, -530 (2018).  Section 44-53-520 sets forth the property that is subject to civil forfeiture, and section 44-53-530 outlines the procedures for civil forfeiture.

In addition, I agree with the majority's conclusion that South Carolina's three-part "instrumentality" test for determining when a seizure constitutes an excessive fine, as articulated in *Medlock v. One 1985 Jeep Cherokee VIN 1JCWB7828FT129001*, 322 S.C. 127, 130, 470 S.E.2d 373, 376 (1996), should be modified in light of subsequent authority on this topic from the United States Supreme Court in *United States v. Bajakajian*, 524 U.S. 321 (1998). In *Bajakajian*, the Supreme Court held that the "gross proportionality" standard is a necessary component of an Eighth Amendment analysis. *See Bajakajian*, 524 U.S. at 334 ("Until today, [] we have not articulated a standard for determining whether a punitive forfeiture is constitutionally excessive. We now hold that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."). Accordingly, I agree the *Medlock* test should be modified to require an examination of whether the civil forfeiture is grossly disproportionate to the underlying criminal offense.

## II. DUE PROCESS

I turn now to the circuit court's finding that South Carolina's civil forfeiture statutes violate state and federal constitutional provisions regarding due process. *See* U.S. Const. Amends. V, XIV, § 1; S.C. Const. art. I, § 3. Specifically, the circuit court concluded the statutes violate due process by (1) placing a burden on the property owner to prove his or her innocence, (2) institutionally incentivizing forfeiture officials to pursue forfeiture actions because, under the statutes, these officials retain 95% of the proceeds, and (3) failing to provide for judicial review or authorization prior to or subsequent to the seizure.

I agree with the majority that Green has not proven the existence of a facial invalidity based on the second and third points. In addition, I agree the circuit court correctly cited the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) as the proper standard for evaluating the sufficiency of due process in a particular proceeding. I depart, however, as to the conclusion to be reached from application of the *Mathews* test because I believe the circuit court correctly determined a facial invalidity exists based on the first point enumerated above—that the statutory scheme violates due process by improperly shifting the burden of proof to property owners. In reaching this conclusion, it is helpful to consider the history of civil forfeiture before analyzing the circuit court's ruling.

## A. HISTORY OF CIVIL FORFEITURE

South Carolina's current civil forfeiture scheme, like that of many jurisdictions, is premised on an ancient fiction that the forfeiture action is against the

property itself, not the alleged wrongdoer. Reliance on this convenient, but inaccurate, legal fiction has been the critical factor in the way courts have historically analyzed the sufficiency of due process in forfeiture cases. More recently, however, this legal fiction has been criticized as an untenable concept that is not compatible with the reality of modern forfeiture proceedings.

"Civil asset forfeiture traces back to biblical times when it was common practice to relinquish anything connected to one's wrongdoing over to God." Luis Suarez, *Guilty Until Proven Innocent: Rethinking Civil Asset Forfeiture and the Innocent Owner Defense*, 5 Tex. A&M J. Prop. L. 1001, 1004 (2019). Many believed that an object could be involved in wrongdoing and should itself be held responsible. *Id.* Scholars point to the Book of Exodus, which instructs that when an ox gores a person to death, the ox is to be killed, but its owner escapes liability. Lydia E. Ellsworth, *Pennies from Heaven or Excessive Fines from Hell? Commonwealth v. 1997 Chevrolet Keeps Civil Asset Forfeiture's Threat to Homeownership in Purgatory*, 63 Vill. L. Rev. 125, 130 (2018) ("The guilt of the ox itself seems to be the first recorded instance of 'guilty property'--the legal fiction upon which civil forfeiture is based.").

Early English common law further developed this line of thought with the deodand procedure, by which any property that caused the death of an English citizen was forfeited to the King as a deodand. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–81, 681 n.16 (1974) ("Deodand" derives from the Latin term "Deo dandum," meaning to be "given to God."); Suarez, *supra*, at 1004. Originally, the property seized under the deodand procedure was used for religious purposes, but the procedure evolved into a source of revenue for the Crown. Suarez, *supra*, at 1004. Later, deodands were "justified as a penalty for carelessness." *Calero-Toledo*, 416 U.S. at 681.

In addition to the deodand procedure, English law relied on two other theories of forfeiture. The second kind of common-law forfeiture, known as forfeiture of estate, fell only upon those convicted of a felony or of treason. *Austin v. United States*, 509 U.S. 602, 611–12 (1993) (explaining those convicted of a felony "forfeited his chattels to the Crown and his lands escheated to his lord" and those convicted of treason "forfeited all of [their] property, real and personal, to the Crown"). This was not an in rem proceeding, so the forfeiture attached only upon the conviction of the offender. *The Palmyra*, 25 U.S. 1, 14 (1827).

A third kind of forfeiture existed by statute. "English law provided for statutory forfeitures of offending objects used in violation of the customs and revenue laws." *Austin*, 509 U.S. at 612 (citation omitted). The most notable of these

were the Navigation Acts of 1660. *Id.* Violations generally resulted in the forfeiture of illegally carried goods and the ship that transported them, regardless of the owner's knowledge of the misconduct. *Id.*; *see also Phile v. The Ship Anna*, 1 U.S. (1 Dall.) 197, 207–08 (C.P. Phila. Cnty. 1787) (justifying the ship's forfeiture on the principle that employers were liable for the acts of employees).

During its formation, the United States considered these English legal theories in developing its admiralty law. The United States did not embrace common law forfeiture, i.e., forfeiture upon conviction for a felony or treason, or the deodand procedure. Rather, it relied on statutory civil forfeiture, which was usually more narrowly tailored.[6] *See generally Pennsylvania v. Irland*, 153 A.3d 469, 475 (Pa. Commw. Ct. 2017) ("Statutory civil forfeiture, as the name suggests, arises by acts of legislatures, state or federal, which ascribe certain criminal character to property, not persons, and provide for their forfeiture to the government." (citation omitted)), *aff'd*, 193 A.3d 370 (Pa. 2018).

Applying concepts from English admiralty law, the United States invoked forfeiture proceedings against ships that committed crimes on the high seas. The United States Supreme Court determined the seizure of ships "was the only adequate means of suppressing the offense or wrong." Suarez, *supra*, at 1004 (citing *Harmony v. United States*, 43 U.S. 210, 233 (1844)). Additionally, another earlier court held that a forfeiture proceeding could be against the ship instead of the ship's owner, "thereby disregarding the will of the owner and the innocent owner defense." *Id.* (citing *United States v. The Little Charles*, 26 F. Cas. 979, 982 (1818)). The logic used in these early decisions in admiralty law created the framework for future civil asset forfeiture proceedings. *Id.*

While the harshness of statutory, in rem forfeitures upon innocent property owners was recognized by early courts, constitutional concerns were not the centerpiece of the analyses at that time; thus, some courts simply deferred to their legislatures. *See, e.g.*, *Phile*, 1 U.S. (1 Dall.) at 207 (stating it would apply the law as written by the legislature "however unjust it seems"). Most individuals sought

---

[6] *See Calero-Toledo*, 416 U.S. at 682 ("Deodands did not become part of the common-law tradition of this country."); *Farley v. $168,400.97*, 259 A.2d 201, 204 (N.J. 1969) (observing forfeiture of estate never took hold in the United States). *Washington v. Alaway*, 828 P.2d 591, 593 (Wash. Ct. App. 1992) (noting that, since colonial times, forfeiture in this country has existed only by statute).

relief from forfeiture through a means outside the court system—a discretionary remission process created by Congress that was overseen by the executive branch of government—and innocent owners who did appear in court did not advance constitutional claims. Kevin Arlyck, *The Founders' Forfeiture*, 119 Colum. L. Rev. 1449, 1505–06 (2019).[7]

When the specter of possible constitutional infirmity was eventually raised, forfeiture was initially upheld based not on any one unified theory, but often due to adherence to existing practice based on a belief that forfeiture had already become too firmly entrenched in American law to be changed. *See Goldsmith-Grant Co. v. United States*, 254 U.S. 505, 511 (1921) ("But whether the reason for section 3450 be artificial or real, it is too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced.").

Forfeiture remained relatively rare in the United States until the twentieth century, as it "was generally confined to cases involving admiralty, piracy, and customs." Christine A. Budasoff, *Modern Civil Forfeiture Is Unconstitutional*, 23 Tex. Rev. L. & Pol. 467, 474–75 (2019). Observers have noted that forfeiture was not limited to certain subjects due to any overt restrictions; rather, those happened to be the areas of the federal government's primary authority in the Founding Era. Arlyck, *supra*, at 1481–82. During the prohibition era of the 1920s, state and federal governments began utilizing civil forfeiture as a means to combat domestic criminal enterprises. *Id.* at 475; *see also* Ellsworth, *supra*, at 131.

---

[7] Arlyck researched more than 500 unpublished federal forfeiture cases from 1789 to 1807 and found forfeiture during the Founding Era was significantly constrained by Congress, but it was done so through a remission procedure implemented by the Treasury Secretary in the Executive Branch, not judges, a point Arlyck states has been overlooked by many courts and commentators. Arlyck, *supra*, at 1449, 1482–84. Congress considered remission essential because forfeiture law imposed a harsh penalty for a violation regardless of intent, and judges had little latitude in reviewing a forfeiture, whereas Treasury Secretaries had the discretion to remit all or part of a forfeiture if they were persuaded there was no intent to defraud the government, and their decisions were final. *Id.* at 1482–86. Arlyck contends the existence of meaningful constraints on forfeiture in the Founding Era calls into question key historical propositions underlying modern jurisprudence and supports the conclusion "that the Constitution imposes some constraints on civil forfeiture's exercise in the present." *Id.* at 1449–50, 1518.

Modern day civil asset forfeiture did not become common until the "war on drugs" beginning in the 1970s and 1980s. *See generally* Budasoff, *supra*, at 475; Suarez, *supra*, at 1004. In the 1980s, Congress expanded civil asset forfeiture by amending the Comprehensive Drug Abuse and Prevention Act of 1970. Suarez, *supra*, at 1004. The amendments authorized the forfeiture of proceeds from drug related offenses, as well as forfeiture of any property that facilitated drug offenses. *Id.* at 1005; *see also* Budasoff, *supra*, at 475 ("Starting in 1984 with the passage of the Comprehensive Crime Control Act, federal law enforcement agencies could keep or sell any property confiscated through civil forfeiture." (footnote omitted)).

The expanding reach of civil forfeiture resulted in corresponding concerns about the fairness of the procedure. *See* Suarez, *supra*, at 1005. Jurisdictions differed as to whether their forfeiture provisions applied to innocent property owners or only those with varying degrees of culpability, and court decisions began to reflect this divide. *Compare United States v. U.S. Coin & Currency*, 401 U.S. 715, 720–21 (1971) ("Even Blackstone, who is not known as a biting critic of the English legal tradition, condemned the seizure of the property of the innocent as based upon a 'superstition' inherited from the 'blind days' of feudalism. And this Court in the past has recognized the difficulty of reconciling the broad scope of traditional forfeiture doctrine with the requirements of the Fifth Amendment." (footnote omitted)); *with Calero-Toledo*, 416 U.S. at 688–89 (upholding the forfeiture of an owner's yacht when a lessee, without the owner's knowledge, brought a marijuana cigarette on board but stating, "This is not to say, however, that the 'broad sweep' of forfeiture statutes remarked in *Coin & Currency* could not, in other circumstances, give rise to serious constitutional questions.").[8]

In *Austin v. United States*, the Supreme Court observed that, "[i]n light of the historical understanding of forfeiture as punishment," the clear focus of federal forfeiture provisions on the culpability of the owner, and the evidence that Congress understood the forfeiture scheme served both to deter and to punish, it was compelled to conclude that forfeiture is, in large part, a "payment to a sovereign as punishment for some offense." *Austin*, 509 U.S. at 621–22 (citation omitted). It expressly held, therefore, that forfeiture is limited by the Eighth Amendment's Excessive Fines Clause. *Id.* at 622.

---

[8] The majority in *Calero-Toledo* acknowledged Chief Justice John Marshall had raised constitutional concerns about forfeiture "over a century and a half ago" in *Peisch v. Ware*, 8 U.S. 347, 363 (1808). 416 U.S. at 689.

In response to these concerns, Congress passed the Civil Asset Forfeiture Reform Act ("CAFRA") in 2000 to "provide a more just and uniform procedure for federal civil forfeitures." Suarez, *supra*, at 1005 & n.35 (quoting CAFRA, Pub. L. No. 106-185, 114 Stat. 202 (2000)). Among other things, CAFRA created the "innocent owner defense." *Id.* at 1005. However, CAFRA placed the burden on the claimant to prove by a preponderance of the evidence that he or she was actually innocent. *Id.*

"Until [this] curative legislation was promulgated twenty years ago, innocence was no defense to forfeiture" under federal law. *United States v. Thompson*, 990 F.3d 680, 686 (9th Cir. 2021) (footnote omitted). In *Thompson*, the United States Court of Appeals for the Ninth Circuit recently commented that the Supreme Court's decision in *Calero-Toledo*, which rejected innocence as a defense in reliance on a long line of cases, "illustrates the injustice to innocent owners prior to the Civil Asset Forfeiture Reform Act." *Id.* at 687.

Since the adoption of CAFRA, civil forfeiture has increased exponentially at both the federal and state levels, "long past its biblical roots." Suarez, *supra*, at 1006. "Across the United States, federal and local law enforcement agencies collectively amass billions of dollars by seizing property deemed to be an instrumentality of illegal activity." Ellsworth, *supra*, at 126; *see also* Budasoff, *supra*, at 475 ("Once an unusual practice, civil forfeiture is now ubiquitous . . . . Nearly every state now has its own body of forfeiture law. Those state laws allow for the forfeiture of a wide range of property, including houses, cars, and bank accounts." (footnotes omitted)). "The changes to civil forfeiture in the twentieth century fundamentally altered civil forfeiture from a tool used rarely and when other remedies were impracticable, to a regular practice depended upon to generate revenue." Budasoff, *supra*, at 476. "Accordingly, reliance on historical forfeiture practices must be closely scrutinized to determine whether those practices support the broad scope and frequent use of modern civil forfeiture." *Id.*

## B.   ANALYSIS OF THE CIRCUIT COURT'S DUE PROCESS RULING

In the current matter, the circuit court concluded South Carolina's forfeiture scheme is invalid because it is burden-shifting on its face. The circuit court explained, "Because S.C.'s forfeiture statutes do not require meaningful proof of any wrongful act by the defendant, they unconstitutionally shift the burden of proof to defendants who, in some cases, are not even charged with a crime."

### (1)   FACIAL CHALLENGE TO FORFEITURE STATUTES UNDER THE SOUTH CAROLINA CONSTITUTION

Green made a facial challenge to the South Carolina civil forfeiture scheme under both the United States Constitution and the South Carolina Constitution. The South Carolina Constitution provides a parallel due process provision to that contained in the United States Constitution. *Cf. State v. Forrester*, 343 S.C. 637, 643, 541 S.E.2d 837, 840 (2001) (observing the South Carolina and United States Constitutions have parallel search and seizure safeguards). "The relationship between the two constitutions is significant because '[s]tate courts may afford more expansive rights under state constitutional provisions than the rights which are conferred by the Federal Constitution.'" *Id.* (alteration in original) (citations omitted). Consequently, "state courts can develop state law to provide their citizens with a second layer of constitutional rights." *Id.* "This relationship is often described as a recognition that the [F]ederal Constitution sets the floor for individual rights while the state constitution establishes the ceiling." *Id.* Accordingly, this Court can interpret our state's constitution to provide greater protection than the Federal Constitution. *See id.*

It was previously noted in discussing the development of civil forfeiture that the English common law theory of forfeiture of estate—by which convicted felons and traitors forfeited their property to the Crown—has been roundly rejected in the United States. *See Austin*, 509 U.S. at 611–12. In South Carolina, our state constitution specifically prohibits the automatic forfeiture of property rights upon conviction for a criminal offense:

> *[N]o conviction shall work . . . forfeiture of estate.*

S.C. Const. art. I, § 4 (emphasis added).

I make this observation at the outset because in examining due process, this Court should not neglect or underestimate the importance of the "second layer of constitutional rights" provided by our own state constitution. South Carolina forfeiture statutes are based upon a presumption of criminality, be it criminal purpose or conduct. Any consideration of the validity or invalidity of the statutory scheme must account for article I, section 4 of the South Carolina Constitution. Further, the Solicitor may not circumvent South Carolina's constitutional protections by simply labeling the confiscation of property a civil forfeiture. The fact that protection from an indiscriminate forfeiture procedure is expressly included in the South Carolina Constitution evidences its significance. Because a *conviction* for a drug-related offense cannot automatically sever an individual's fundamental property interests under our state constitution, something even less than a conviction is clearly insufficient to result in an automatic forfeiture, and due process must be afforded in all instances to prevent an unlawful deprivation. *Cf. Last v. MSI Constr.*

*Co*. 305 S.C. 349, 409 S.E.2d 334 (1991) (holding article I, section 4 of the South Carolina Constitution prohibits the deprivation of an inmate's property interest in workers' compensation benefits without due process of law).

As the decision in *Last* illustrates, this provision in the South Carolina Constitution has previously informed this Court's analysis of due process questions, even in civil cases. Moreover, to the extent the majority argues this constitutional provision is not implicated because our civil forfeiture scheme does not impose an "automatic forfeiture," I disagree. On its face, our statutory scheme states that property "is *forfeited and transferred* to the government *at the moment of illegal use*," and "[s]eizure and forfeiture proceedings confirm the transfer." *See* S.C. Code Ann. § 44-53-520(d) (2018) (emphasis added). Accordingly, I believe our state constitution is properly referenced for the proposition that South Carolina has constitutionally recognized the importance of protecting an individual's fundamental property rights, and for my conclusion that South Carolina's civil forfeiture scheme fails to afford due process because it is burden-shifting, thereby effectively rendering many seizures final.

## (2) THREE-PART DUE PROCESS FRAMEWORK

Decisions of the United States Supreme Court "indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors": (1) the private interest that will be affected by the action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest in the challenged procedure, considering the burdens an additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

### (a) FACTOR 1: The Interest at Stake

I begin by identifying the central principle informing this analysis: An individual's ownership of property is a fundamental right recognized prior to our nation's formation and adopted by our nation's founders. *See, e.g.*, John Adams, *A Dissertation on the Canon and the Feudal Law* (1765) ("Property is surely a right of mankind as real as liberty."); John Locke, *Two Treatises of Government*, Book II, ch. 7, § 87 (1690) (stating an individual is born with inalienable and natural rights, among them the right to property, defined as life, liberty, and estate).

This principle was later echoed in the decisions of the United States Supreme Court, which has characterized the right to property as equal to, and inextricably

intermingled with, an individual's fundamental right to liberty. *See Lynch v. Household Fin. Corp.*, 405 U.S. 538, 552 (1972) ("[T]he dichotomy between personal liberties and property rights is a false one. Property does not have rights. People have rights. The right to enjoy property without unlawful deprivation . . . is in truth, a 'personal' right, whether the 'property' in question be a welfare check, a home, or a savings account. In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other.").

As discussed above, the South Carolina Constitution recognizes the fundamental importance of an individual's property rights by specifically affording a layer of protection against unlawful deprivations through its prohibition on the automatic forfeiture of a person's property in the event of a criminal conviction. *See* S.C. Const. art. I, § 4 ("[N]o conviction shall work . . . forfeiture of estate."). Consequently, an individual clearly has an important interest in private property that may be subject to unlawful deprivation under South Carolina's civil forfeiture scheme, a point the majority acknowledges.

### (b) FACTOR 2: Risk of Erroneous Deprivation of Property Rights & Need for Additional Safeguards

The majority also acknowledges that the Solicitor's burden to establish only probable cause for a seizure of private property is "admittedly a low threshold" and that it has a "burden-shifting aspect." However, it appears to justify this procedure on the basis there are safeguards in place to protect an innocent property owner. It also notes similar schemes exist in other jurisdictions: "The burden-shifting aspect is in keeping with similar statutory schemes across the country, though some state statutes require a heightened preponderance of the evidence standard." In my view, we should not conclude the "burden shifting aspect" of South Carolina's statutory scheme is acceptable because it has methods to recover wrongly taken property or simply because this is the way things have always been done. Instead, I would find there is an unacceptable risk of an erroneous deprivation of an individual's property rights and a need for additional safeguards. This is particularly true in light of the growing alarms raised by constitutional scholars and some courts that (1) the fiction that a forfeiture action is against the property itself—and not its owner—has been used far beyond its original purpose, and (2) the safeguards in place in many jurisdictions provide only the illusion of an innocent owner defense.

### (i) Fiction of In Rem Actions Expanded Beyond Original Purpose

A key difference between a civil and a criminal forfeiture proceeding is the identity of the defendant. *See generally Mims Amusement Co. v. S.C. Law Enf't Div.*, 366 S.C. 141, 150 n.4, 621 S.E.2d 344, 348 n.4 (2005). In a civil forfeiture, the government proceeds against the property, a thing (*rem*), whereas in a criminal forfeiture proceeding, the government proceeds against a human being (*personam*). *Id.* A criminal forfeiture proceeding generally arises during the criminal prosecution of a person. *Id.*

At its core, the civil forfeiture process that developed in this country is purely a legal fiction. *See Horner v. Curry*, 125 N.E.3d 584, 597 (Ind. 2019) ("Civil forfeiture 'is a device, a legal fiction, authorizing legal action against inanimate objects for participation in alleged criminal activity, regardless of whether the property owner is proven guilty of a crime—or even charged with a crime.'" (citation omitted)).

Civil forfeitures began as a matter of jurisdictional convenience and were narrower in their application than modern forfeiture laws. *See* Stefan Herpel, *Toward a Constitutional Kleptocracy: Civil Forfeiture in America*, 96 Mich. L. Rev. 1910, 1924 (1998) (Civil "forfeiture was used to redress violations of maritime and revenue law, and to facilitate the confiscation of enemy property in wartime. Civil forfeiture, then, was viewed as a narrow exception to the basic requirement that criminal proceedings (with all of the procedural protections that have come to be associated with such proceedings) be used to enforce the criminal law."). Significantly, historical forfeiture laws were limited to only a few specific subject matters, such as customs and piracy. *Leonard v. Texas*, 137 S. Ct. 847, 849 (2017) (Thomas, J., respecting the denial of certiorari). "Proceeding *in rem* in those cases was often justified by necessity, because the party responsible for the crime was frequently located overseas and thus beyond the personal jurisdiction of United States courts." *Id.* Historical laws were also narrow as to the type of property they encompassed, as "they typically covered only the instrumentalities of the crime (such as the vessel used to transport the goods), not the derivative proceeds of the crime (such as property purchased with money from the sale of the illegal goods)." *Id.*

As a result, it has been argued that founding-era precedents do not actually support the use of modern forfeiture practices. *See id.* at 848 ("The Court has justified its unique constitutional treatment of civil forfeiture largely by reference to a discrete historical practice that existed at the time of the founding."); *id.* at 849 ("I am skeptical that this historical practice is capable of sustaining, as a constitutional matter, the contours of modern practice . . . ."); *see also* Herpel, *supra*, at 1925–26 (arguing founding-era precedents do not support the use of forfeiture against purely

domestic offenses when the owner is plainly within the personal jurisdiction of both state and federal courts), *cited in Leonard*, 137 S. Ct. at 849.

Reliance on this legal fiction has allowed courts to dispense with the normal safeguards that would prevent the government from taking the property of its citizens, often when they have not been convicted of wrongdoing, because this legal fiction affects the burden of proof and the rights to counsel and a jury trial. *See* Note, *How Crime Pays: The Unconstitutionality of Modern Civil Asset Forfeiture as a Tool of Criminal Law Enforcement*, 131 Harv. L. Rev. 2387, 2395 (2018) [hereinafter *How Crime Pays*] ("Because civil forfeiture is not a criminal proceeding, constitutional protections that attach only to criminal prosecutions are inapposite. These include the Confrontation Clause, the Sixth Amendment right to counsel, and 'the due process requirement that guilt in a criminal proceeding be proved beyond a reasonable doubt.'" (footnotes omitted)); *Leonard*, 137 S. Ct. at 847–48 ("Civil proceedings often lack certain procedural protections that accompany criminal proceedings, such as the right to a jury trial and a heightened standard of proof.").

The expansion of this in rem procedure has gone far beyond the use that was originally contemplated in customs and admiralty law, and it has been described as "an ancient form without substantial modern justification":

> In *Burnham v. Superior Court* [495 U.S. 604 (1990)], Justice Scalia quoted from *Schaffer v. Heitner* [433 U.S. 186 (1977)]: "[t]he fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification." While in the context of *Burnham* the Court was discussing *quasi in rem* jurisdiction, the same principle applies to *in rem* jurisdiction in civil asset forfeiture actions. American civil asset forfeiture law is nothing other than an ancient form filtered through customs and admiralty law. The ancient theology of expiation of guilty property is no more than ancient superstition. Moreover, the fiction of personification has fallen into disrepute in admiralty law.

David Benjamin Ross, Comment and Note, *Civil Forfeiture: A Fiction That Offends Due Process*, 13 Regent U. L. Rev. 259, 264 (2000-2001) (footnotes omitted).

The convenience of the fiction of in rem proceedings to reduce drug offenses "does not justify allowing law enforcement officials to circumvent fundamental constitutional due process rights," particularly where this procedure deprives individuals of substantial assets each year. *Id.* "Continuing to base jurisdiction on the legal fiction of personification, while perhaps convenient, is merely the perpetuation of an ancient form that ignores present reality—depriving individuals of cars, houses, and bank accounts is a significant punishment, more than can be inflicted in many criminal proceedings." *Id.*

Legal commentators have noted, furthermore, that the United States Supreme Court has itself recently abandoned the legal fiction that the property, rather than the owner, is guilty of wrongdoing and has recognized that it is the owner who suffers the consequences of the deprivation of property through forfeiture. *See How Crime Pays*, *supra*, at 2396–97 ("While civil forfeiture was historically justified on the grounds that the forfeited property itself was guilty and thus forfeiture served to hold the property rather than the owner accountable, the Court has abandoned this legal fiction." (footnote omitted)); *see also id.* at 2397 n.15 ("Distinguishing between in rem and in personam punishments does not depend upon, or revive, the fiction alive in [*Various Items of Personal Property v. United States*, 282 U.S. 577, 581 (1931)], but condemned in *Austin* [509 U.S. at 615 n.9], that the property is punished as if it were a sentient being capable of moral choice. It is the owner who feels the pain and receives the stigma of the forfeiture, not the property." (quoting *United States v. Usery*, 518 U.S. 267, 295 (1996) (Kennedy, J., concurring) (alterations in original) (emphasis omitted in original))).

If the current "jurisprudential shift" recognizes forfeiture is implemented because an owner who allows his property to be used in an illegal manner is somehow negligent or culpable and is being punished, at least in part, for a misuse of the property, then it is arguable that the higher safeguards that normally correspond to an evaluation of culpable conduct become more relevant. *How Crime Pays*, *supra*, at 2397. The inclusion of the innocent owner defense in modern statutes like CAFRA, which instituted reforms to federal forfeiture law, also supports the inference that there now exists "an intent to hold owners accountable only where scienter exists." *Id.*

Commentators have noted that the collapse of the guilty property justification is not the only change that suggests civil forfeiture has become heavily punitive; law enforcement practices have also changed. *Id.* They point to the statement of Justice Kennedy, "[w]e would not allow a State to evade its burden of proof by replacing its criminal law with a civil system in which there is no presumption of innocence." *Id.* & n.110 (alteration in original) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 94 (1992)

(Kennedy, J., dissenting)). They argue the use of criminal law enforcement techniques that have a goal of obtaining a forfeiture, rather than obtaining an arrest, demonstrates civil forfeiture has become a replacement for criminal law enforcement. *Id.* at 2397. Just as plea deals offer defendants fewer charges and a potentially lessened punishment for foregoing the trial process, "cash-for-freedom" waivers now guarantee certain criminal charges will not be filed in exchange for not contesting the forfeiture of personal property. *Id.* at 2397–98. These practices tie the seizure to the criminal punishment process in a way that was never contemplated historically. *Id.* at 2398. At its most egregious, the use of pretextual traffic stops to obtain forfeitures similarly substitutes civil forfeiture for criminal punishment while serving as a fund-raising mechanism for law enforcement.[9] *See generally id.* at 2397.

Although the forfeiture process is characterized as civil, some early cases recognized forfeiture as being analogous to a penalty and referenced the "beyond a reasonable doubt" burden of proof. *See United States v. Brig Burdett*, 34 U.S. 682, 690 (1835) (stating a forfeiture for violation of a revenue law should be established beyond a reasonable doubt); *see also Boyd v. United States*, 116 U.S. 616, 633–634 (1886) (finding "proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him, though they may be civil in form, are in their nature criminal"). Later cases continued to point out this dichotomy. *See Austin*, 509 U.S. at 621–22 (observing civil forfeiture has both remedial and punitive aspects but concluding forfeiture is, in large part, punishment, so it is limited by the Eighth Amendment).

### (ii) Illusion of Innocent Owner Defense

Although an innocent owner defense has now been included in the forfeiture law under federal procedures and under many state statutes, including South Carolina's, its presence presents merely the illusion of due process when, with

---

[9] In South Carolina, for example, law enforcement agencies conduct broad sweeps, such as "Operation Rolling Thunder" and "Operation Strike Force," which annually target drivers for traffic violations on heavily-travelled interstates to provide probable cause for searches and, thus, civil forfeiture, with 95% of the proceeds going to law enforcement and prosecutors. *See* Nathaniel Cary, *Inside Look: How SC Cops Swarm I-85 and I-26, Looking for "Bad Guys,"* Greenville News (Feb. 3, 2019, updated Apr. 22, 2020), https://www.greenvilleonline.com/in-depth/news/2019/02/03/operation-rolling-thunder-sc-civil-forfeiture-interstate-95-interstate-26/2458314002/.

usually only a showing of *probable cause*, the government places the burden of proof upon property owners to establish sufficient grounds to reclaim their property. *See, e.g.*, S.C. Code Ann. § 44-53-586(b)(1) (2018) (providing if probable cause for the seizure is first shown by the state, the burden shifts to the innocent property owner to demonstrate, by a *preponderance of the evidence*, "that the person or entity was not a consenting party to, or privy to, or did not have knowledge of, the use of the property which made it subject to seizure and forfeiture").

An innocent owner faces a difficult burden of proving a negative. Because the proceeding is deemed civil, property owners are not entitled to counsel. Consequently, they must either represent themselves or try to obtain counsel at their own expense, which in some cases could exceed the value of the property they are trying to reclaim. *See* Suarez, *supra*, at 1006–07; Lisa Knepper et al., *Policing for Profit: The Abuse of Civil Asset Forfeiture* 6, 20–21 (Inst. for Just., 3d ed. 2020).

An investigation by Greenville News and Anderson Independent Mail reporters, with assistance from the USA Today Network, found forfeiture cases in South Carolina overwhelmingly ended in the government's favor.[10] Their review of cases showed more than 70% of the cases filed against individual property owners in South Carolina were won by default, nearly 20% of people who had assets seized were not charged with a related crime, and roughly the same number were charged with an offense but were not convicted. Anna Lee et al., *Exclusive: How Civil Forfeiture Errors, Delays Enrich SC Police, Hurt People*, Greenville News (Jan. 30, 2019, updated Apr. 22, 2020), https://www.greenvilleonline.com/in-depth/news/taken/2019/01/29/civil-forfeiture-south-carolina-errors-delays-property-seizures-exclusive-investigation/2460107002/.

Some innocent owners give up their claims in the face of the procedural hurdles, including the lack of legal representation and the costs involved in

---

[10] A team of journalists examined all civil forfeitures in South Carolina's forty-six counties during the period from 2014 to 2016, a total of more than 3,000 cases. They noticed that, demographically, almost two-thirds of people who had their property taken were black men; further, poor individuals often could not pursue the return of their property or ward off a threatened seizure. *See* William Ramsey, *How We Brought TAKEN to Life*, Greenville News (Jan. 27, 2019, updated Jan. 17, 2020), https://www.greenvilleonline.com/story/news/taken/2019/01/27/taken-civil-forfeiture-investigation-greenville-news-anderson-usa-today-network-journalism/2458361002/ (discussing the methodology of the investigation).

challenging the seizure. *See generally* William Ramsey, *What's in the TAKEN Civil Forfeiture Investigation*, Greenville News (Jan. 27, 2019, updated Jan. 17, 2020), https://www.greenvilleonline.com/story/news/taken/2019/01/27/guide-taken-investigative-series-greenville-news-journalism/2638405002/. This is also the trend nationally:

> The innocent owner defense creates the illusion that individuals are afforded proper redress to retain their property when it is taken by the government. Initiating the procedure can be costly and time consuming. When and if the individual actually gets to litigation, the difficulty in proving one's innocence is a task that even our nation's founders believed would never have to be surmounted. As James Madison once said, "[t]he personal right to acquire property, which is a natural right, gives to property, when acquired, a right to protection, as a social right." Proving one's innocence to retain one's right to property is a burden that is extremely difficult to prove . . . . Therefore, it is not surprising that 90% of forfeitures are uncontested while considering that only 8% of cash seizures made by the DEA between 2007 and 2016 were eventually returned to their owners. Individuals know that the likelihood of regaining possession of property is slim to none, and if they are able to retrieve their property, it may be cost-prohibitive.

Suarez, *supra*, at 1015–16 (alteration in original) (footnotes omitted).

While the onerous nature of the burden on property owners might not have caused alarm bells when the items subject to forfeiture were illegal drugs and paraphernalia related to trafficking, the vastly expanded use of this procedure to seize cash, cars, boats, and even family homes on the basis they are drug-associated "contraband" has triggered warnings regarding the erosion of due process. *See* Stephen J. Moss, Comment, *Clear and Convincing Civility: Applying the Civil Commitment Standard of Proof to Civil Asset Forfeiture*, 68 Am. U. L. Rev. 2257, 2259 (2019) ("The abuses of civil asset forfeiture are well-known, well-documented, and well-ridiculed."); *see also* Dick M. Carpenter II et al., *Policing for Profit: The Abuse of Civil Asset Forfeiture* 2 (Inst. for Just., 2d ed. 2015) ("Civil forfeiture threatens the constitutional rights of all Americans. Using civil forfeiture, the government can take your home, business, cash, car or other property on the mere

suspicion that it is somehow connected to criminal activity—and without ever convicting or even charging you with a crime.").

Courts and commentators are beginning to express concern as to the sweeping changes in the use of in rem forfeiture proceedings that have been upheld under existing precedent and the increasing potential for abuse as escalating sums of property are forfeited each year. *See generally Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) ("Ours is a world filled with more and more civil laws bearing more and more extravagant punishments. Today's 'civil' penalties include . . . forfeiture provisions that allow homes to be taken . . . ."); *Leonard*, 137 S. Ct. at 848 ("This system—where police can seize property with limited judicial oversight and retain it for their own use—has led to egregious and well-chronicled abuses."); Robert Lieske, *Civil Forfeiture Law: Replacing the Common Law with a Common Sense Application of the Excessive Fines Clause of the Eighth Amendment*, 21 Wm. Mitchell L. Rev. 265, 267 & n.18 (1995) (asserting civil forfeiture would be deemed unconstitutional if not for the reliance on ancient doctrines that are no longer viable in modern society and the tendency of courts to simply reiterate that forfeiture statutes "have always been permitted in the past").

For these reasons, we should not rely on a blind recitation of prior case law—premised on a questionable legal fiction—that finds no impropriety when a civil forfeiture law places a higher burden on innocent owners to recover their property than the burden the state faces to seize it. In the opinion of many legal scholars, this legal fiction should not be retained simply because it is deemed too firmly fixed in our jurisprudence to be replaced. *Cf. Bennis v. Michigan*, 516 U.S. 442, 453 (1996) (admitting the "argument that the Michigan forfeiture statute is unfair because it relieves prosecutors from the burden of separating co-owners who are complicit in the wrongful use of property from innocent co-owners . . .[,] in the abstract, has considerable appeal," but stating, "We conclude today, as we concluded 75 years ago, that the cases authorizing actions of the kind at issue are 'too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced.'" (quoting *Goldsmith-Grant Co. v. United States*, 254 U.S. 505, 511 (1921)); *id.* at 454 (1996) (Thomas, J., concurring) ("One unaware of the history of forfeiture laws and 200 years of this Court's precedent regarding such laws might well assume that such a scheme is lawless—a violation of due process.").

In my view, the majority clings to precedent regarding an ancient legal fiction, despite its misgivings, because this is the way things have always been, and then it insulates the fiction from further scrutiny behind an unassailable presumption of constitutionality. I believe, however, that an in-depth analysis of the historical

antecedents discredits the fundamental basis for this antiquated precedent, and current sensibilities should compel us to conclude otherwise. The majority dismisses the authority cited by the circuit court, finding it to be either distinguishable or an unpersuasive "outlier." For example, the circuit court relied on *Nelson v. Colorado*, 137 S. Ct. 1249 (2017), in which the United States Supreme Court held that Colorado's legislation by which "a defendant must prove her innocence by clear and convincing evidence to obtain the refund of costs, fees, and restitution paid pursuant to an invalid conviction" did "not comport with due process." *Id.* at 1255. Applying the *Mathews* test, the Supreme Court stated the petitioners "have an obvious interest in regaining the money they paid to Colorado" and, once their "convictions were erased, the presumption of their innocence was restored." *Id.* As a result, "Colorado may not retain funds taken from [the petitioners] solely because of their now-invalidated convictions, . . . for Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." *Id.* at 1256. The Supreme Court found there is a risk of an erroneous deprivation of the petitioners' interest in the return of their funds, where the law conditioned refunds on the petitioners' proof of their innocence by clear and convincing evidence. *Id.* While the majority dismisses *Nelson* as distinguishable, at its core *Nelson* involves the application of the *Mathews* framework, which is present here, and any dissimilarity does not vitiate the essential truth contained in the Supreme Court's conclusion: "[T]o get their money back, [petitioners] *should not be saddled with any proof burden*." *Id.* (emphasis added). The Supreme Court's admonition is no less true in the context of this appeal than it is in *Nelson*.

A growing recognition that civil forfeiture does not satisfy constitutional due process requirements has resulted in many states abolishing civil forfeiture or reforming their procedures. According to statistics compiled by the Institute for Justice, just since 2014, thirty-seven states and the District of Columbia have reformed their laws governing civil forfeiture. *Civil Forfeiture Reforms on the State Level*, Institute for Justice, https://ij.org/activism/legislation/civil-forfeiture-legislative-highlights/ (last visited Aug. 15, 2022). Four states have abolished civil forfeiture in its entirety. *Id.* (indicating "four states—North Carolina (1985), New Mexico (2015), Nebraska (2016) and Maine (2021)—have abolished civil forfeiture entirely and only use criminal law to forfeit property").

The specific problem as to the burden of proof is one that exists in many jurisdictions because it is a common component of the procedures for civil forfeiture. A sizable minority of states has now removed the burden from innocent owners and placed it on the government. *See id.* ("Fifteen states and the District of Columbia require the government to bear the burden of proof for innocent-owner claims,"

including Alabama, Arizona, California, Colorado, Connecticut, Florida, Iowa, Mississippi, Montana, New Mexico, New York, Oregon, Pennsylvania, Utah, and Wisconsin.). Further, another sizable minority require a criminal conviction. *See id.* ("Sixteen states require a conviction in criminal court to forfeit most or all types of property in civil court. However, these conviction provisions are not the same as ending civil forfeiture."). I find South Carolina's placement of a burden of proof upon an innocent owner that outweighs the burden placed upon the state to seize the property creates an unacceptable risk of an erroneous deprivation of an individual's property rights.

### (c) FACTOR 3: Government's Interest

I further find the government does not have a strong interest in the current procedure and should bear the burden of additional requirements because, as the circuit court observed, the government has "zero legitimate interest in seizing or withholding money or other property when the defendant has not been convicted of a crime, and the government has not proven that the property was connected to a crime."

It is important to distinguish the types of property at issue because it has a bearing on the strength of the government interest at stake. As the majority notes, our civil forfeiture statutes address two types of property that are subject to civil forfeiture: (1) contraband per se (property such as narcotics and smuggled goods, the possession of which, by itself, is a crime), and (2) derivative contraband (property used in the commission of a crime or traceable to the proceeds of criminal activity, such as tools or cash). *Mims Amusement Co. v. South Carolina Law Enforcement Division*, 366 S.C. 141, 149–50, 621 S.E.2d 344, 348 (2005).

The government has an obvious remedial interest in removing pure contraband from public circulation, so whether the property owner is blameless or unknowing does not affect a state's power to seize them. *See generally Bennis v. Michigan*, 516 U.S. 442, 459 (1996) (Stevens, J., dissenting) (discussing the types of property subject to seizure and distinguishing the government interest at stake). Justice Stevens noted "[f]orfeiture is more problematic for [derivative contraband], both because of its potentially far broader sweep, and because the government's remedial interest in confiscation is less apparent." *Id.* at 460. Justice Stevens noted many of the earliest cases of seizure involved ships that engaged in piracy on the high seas, in the slave trade, or in smuggling goods into the United States; because the entire mission of the ship was unlawful, admiralty law treated the ship as the offender and the cargo was seized despite the absence of fault by the owner. *Id.* at 460–61 (footnotes omitted). The key difference, however, is that "under 'the

maritime law of the Middle Ages the ship was not only the source, but the limit, of liability.'" *Id.* at 461 (citation omitted). Without question, the government can have no legitimate interest in compelling the forfeiture of property from an innocent owner or one who has not been afforded due process.

### (d) RESULT OF APPLYING *MATHEWS* FRAMEWORK

Civil forfeiture has expanded far beyond its historical roots and far beyond the contemplations of our nation's founders and earlier decisions justifying its use. Over time, the lack of normal safeguards through use of the in rem process, the exponential increase in the amount of property seized, and the documented instances of abuse have created a national crisis.

Several years ago, a bipartisan group of over 100 members of the South Carolina General Assembly expressed concerns over our state's civil forfeiture procedures. Several bills were proposed and lengthy discussions ensued over the perceived need for reform. *See* Nathaniel Cary, *Sweeping Changes to SC's Civil Asset Forfeiture Stalled for the Year*, The State (Apr. 16, 2019) (written by a reporter for The Greenville News), https://www.thestate.com/news/politics-government/article229313124.html (indicating changes in the forfeiture statutes are needed but would have an impact on related provisions that must also be addressed, necessitating further scrutiny by the legislature). I agree that changes are needed and that the enactment of laws is solely within the purview of the General Assembly. *See generally Townsend v. Richland Cnty.*, 190 S.C. 270, 274, 2 S.E.2d 777, 779 (1939) (observing the law-making authority of the government rests with the legislature).

Until changes are made in this regard, however, I am compelled to agree with the circuit court that South Carolina's civil forfeiture scheme, *as currently formulated*, unconstitutionally places a burden on individuals to prove their innocence in violation of due process requirements under our state and federal constitutions, thus rendering it facially invalid. As a result, I would affirm the circuit court on this point. *See* U.S. Const. Amends. V, XIV, § 1; S.C. Const. art. I, § 3. Because even a conviction for a drug-related offense cannot automatically sever an individual's fundamental property rights under our state constitution, *see* S.C. Const. art. I, § 4, a statutory scheme that places an undue burden upon an individual to retain

his or her property based on something even less than a conviction cannot withstand constitutional scrutiny.[11]

The majority acknowledges that the burden-shifting nature of civil forfeiture laws has been widely criticized in recent years, yet maintains this Court is "not called upon to decide whether a change in the law would be wise" and expresses concern that this Court should not infringe upon legislative authority. The majority's concern is misplaced. This Court does not intrude upon legislative authority when it simply fulfills its appellate role of reviewing the constitutionality of existing legislation and expressly leaves any future statutory changes to the General Assembly. For all of the foregoing reasons, I concur in part and dissent in part.

---

[11] Although I find our current civil forfeiture scheme is unconstitutional because it is burden-shifting, I do not believe criminal forfeiture is unconstitutional unless it is grossly disproportional to the gravity of the offense and is not connected to the offense. *See generally United States v. Bajakajian*, 524 U.S. 321, 334 (1998). For this reason, I invite the General Assembly to consider replacing the current civil forfeiture scheme with a forfeiture procedure that is predicated on a conviction, as a number of states have already done, instead of probable cause.